OPINION OF THE COURT
Richard T. Andrias, J.
Defendant, an attorney-at-law, is charged in a one-count indictment with criminal contempt in the first degree, a class E felony under Penal Law § 215.51. This provision makes it unlawful to "contumaciously and unlawfully” refuse to be sworn as a witness, before a Grand Jury, or, when after having been sworn as a witness, refuse to answer any legal and proper interrogatory. The penalties for conviction include fines and imprisonment (Penal Law § 70.00 [2] [d]; § 80.00) and in the case of an attorney, automatic disbarment (Judiciary Law § 90 [4] [a]).
Attorney Lynne Stewart represented Dominick Maldonado (also known as Mingo), one of several individuals charged with being members of an alleged narcotics conspiracy. The indictment against attorney Stewart alleges that in relation to legal services rendered to her client Dominick Maldonado, she refused to produce records and to answer questions regarding her fee arrangements and retainer agreements, before a Grand Jury investigating a major narcotics operation on the Lower East Side.
The defendant moves this court to dismiss the indictment charging her with Penal Law contempt on various legal grounds including that the evidence before the Grand Jury was legally insufficient, that the People improperly failed to pursue the remedy of "civil” (Judiciary Law) contempt before seeking to punish her for criminal (Penal Law) contempt, and that the Assistant District Attorney committed prosecutorial misconduct in securing the indictment. Alternatively, she seeks dismissal of the indictment on equitable grounds pursuant to CPL 210.40 (Clayton motion).
PROCEDURAL BACKGROUND
On or about July 5, 1989, attorney Stewart was served with *778 a Grand Jury subpoena by agents of the Special Narcotics Prosecutor. The subpoena directed Ms. Stewart to appear and testify about the fees and fee arrangements regarding her client. The defendant moved to quash the subpoena.
On August 3, 1989 the Hon. Leslie Crocker Snyder issued a written decision, denying the motion to quash. (Matter of Grand Jury Subpoena [Stewart], 144 Misc 2d 1012.) The Appellate Division affirmed, finding that information sought about fee arrangements was not privileged (156 AD2d 294).
On January 18, 1991, attorney Stewart was called before the Grand Jury and refused to answer the various questions propounded by the prosecuting attorney concerning fee arrangements and retainer agreements, whether she had represented Dominick Maldonado, how she came to represent Dominick Maldonado and her fee arrangements concerning said representation.
THE LEGAL SETTING AND BACKGROUND
Absent special circumstances, information about the identity of a client or about the nature and source of the fee is not privileged and an attorney may be subpoenaed before a Grand Jury to testify on these subjects. While the fee "privilege” question appears well settled, the constitutional dimensions of the issue of subpoenaed attorneys are not.
These constitutional issues are not merely of theoretical concern. New York has a disciplinary rule regarding such "confidences and secrets”. (Code of Professional Responsibility DR 4-101 [22 NYCRR 1200.19] [a lawyer shall not knowingly reveal a confidence or secret of a client].)
The prospect of the lawyer testifying about matters that arose in confidential discussions has numerous negative ramifications. First, the lawyer, even where the subject is fees from a third party, may ultimately be a witness against his or her client, which is a potential violation of Code of Professional Responsibility DR 5-102. (Code of Professional Responsibility DR 5-102 [22 NYCRR 1200.21].) Secondly, lay clients do not necessarily draw fine distinctions between the legal terms "privilege”, "confidence” and "secrets”: "The very presence of the attorney in the grand jury room, even if only to assert valid privileges, can raise doubts in the client’s mind as to his lawyer’s unfettered devotion to the client’s interests and thus impair or at least impinge upon the [lawyer]-client relationship.” (In re Grand Jury Investigation [Sturgis], 412 F Supp *779 943, 946 [ED Pa 1976].) One cannot help but ask if that is what occurred here. Ms. Stewart was first served with a subpoena on or about July 5, 1989. The litigation over the motion to quash lasted the summer and fall of 1989 and on November 9, 1989, apparently on his own initiative, Ms. Stewart’s client, Mr. Maldonado, called the prosecutor.
Finally there are broader policy implications to this practice of prosecutors issuing Grand Jury subpoenas to lawyers. This chill on the lawyer/client relationship has been termed by one Federal Judge to be an "arctic effect with the non-salutary purpose of freezing criminal defense attorneys into inanimate ice floes, bereft of the succor of constitutional safeguards. * * * Also to be considered is the * * * reluctance of capable attorneys to continue or to consider a full or partial career in the practice of criminal law and the further depletion in the paucity of capable trial lawyers because of a concatenation of events leading to the abuse of process” (In re Grand Jury Matters, 593 F Supp 103, 107 [D NH 1984], affd 751 F2d 13 [1st Cir 1984]).
defendant’s legal and equitable motions
After inspecting the Grand Jury minutes the court finds that legally sufficient evidence was presented before the Grand Jury to indict the defendant for the crime of criminal contempt under Penal Law § 215.51. Furthermore, this court has concluded that neither of the legal grounds advanced by the defendant would independently justify dismissal of the indictment. Nevertheless, each of these legal arguments raises serious issues and they will be examined and discussed in the context of the court’s examination and consideration of the 10 statutory Clayton factors (CPL 210.40 [1]) in defendant’s motion to dismiss the indictment in the interests of justice.
DEFENDANT’S CLAYTON MOTION
Certainly, a Clayton motion is not an inappropriate vehicle to explore the implications of what transpired here because the court is in the singular position of being able to assess the entire set of circumstances within the confines of such a motion. Our strict rules of evidence would more than likely prohibit the defendant from being able adequately to explain the legal setting and reason for acts which to a layperson would initially at least appear to be lawless and defiant. Furthermore, since a jury does not concern itself with punish *780 ment, it would not be made aware of the consequences of a felony conviction for Ms. Stewart, namely automatic disbarment. Finally, the only witness to appear before the Grand Jury who testified regarding the alleged fee arrangement of Maldonado and Ms. Stewart was Ms. Chang, who is now deceased. Thus Ms. Stewart would be deprived of an opportunity to fully explore this issue in her own defense.
(a) penal law versus judiciary law contempts
If the prosecutor’s objective was to obtain information and not merely to punish attorney Stewart for her withholding of information, why not utilize the corresponding Judiciary Law contempt provision which has historically been employed to coerce recalcitrant witnesses (Matter of Koota v Columbo, 17 NY2d 147 [1966]). By utilizing Penal Law contempt the prosecutor essentially foreclosed an immediate and adequate appellate review of the questions asked before the Grand Jury and turned the focus to punishing attorney Stewart, thereby ending any chance to obtain the sought-after information.
The statutory language of Judiciary Law contempt ("Contumacious and unlawful refusal to be sworn as a witness; or, after being sworn, to answer any legal and proper interrogatory”, Judiciary Law § 750 [5]) is substantially similar to the Penal Law contempt provision under which Ms. Stewart was indicted: "[W]hen [a witness] contumaciously and unlawfully refuses to be sworn as a witness, before a grand jury, or when after having been sworn as a witness, before a grand jury, [the witness] refuses to answer any legal and proper interrogatory”. (Penal Law § 215.51.) The District Attorney argues correctly that New York law allows the prosecutor discretion to proceed under either of two applicable provisions, and he could have argued additionally that the Penal Law section is more specific in that it utilizes the words "grand jury”.
The question the court must consider in weighing defendant’s Clayton motion, however, is not the legality of the prosecutor’s choice, but why he chose criminal contempt over the Judiciary Law contempt and whether such a choice was just and fair under all the circumstances.
While "civil” in nature, Judiciary Law contempt contains strong provisions to coerce testimony, the prosecuting attorney’s stated purpose. Under Judiciary Law § 751, the recalcitrant witness may be fined, not exceeding $1,000 or imprisoned for not exceeding 30 days "or both, in the discretion of *781 the Court” (emphasis added). Should the 30-day confinement not achieve the desired result of obtaining testimony, there would be nothing to prevent the prosecutor from bringing Ms. Stewart back before the Grand Jury as long as the Grand Jury remained in session. Furthermore, having been subjected to "civil” contempt of Judiciary Law § 750 does not shield one from being thereafter punished for Penal Law contempt for the very "same conduct” (see, Penal Law § 215.54).
In its motion to dismiss the indictment as a matter of law, the defense relies on a long line of Federal cases to support the proposition that the prosecution must resort to civil (i.e., Judiciary Law) contempt first (i.e., " '[t]he least possible power adequate to [achieve] the end proposed’ ”, Shillitani v United States, 384 US 364, 371 [1966], citing Anderson v Dunn, 6 Wheat [US] 204, 231 [1821]), before imposing criminal sanctions. However, this court can find no basis in New York law for such a requirement. In fact, if the purpose of contempt is to coerce (i.e., to get defendant to testify rather than to punish), then the more appropriate route is through contempt under the Judiciary Law. The question then remains, was it just that the prosecutor chose to immediately seek Penal Law sanctions against Ms. Stewart?
The Penal Law route chosen by the prosecutor, while legal in a technical sense, all but precluded a review of the appropriateness of Ms. Stewart’s question-by-question refusals. With Judiciary Law contempt, the witness could have been confined while the issue was heard by higher courts on an expedited basis (or the jailing could have been stayed briefly for an appellate review). However, with Penal Law contempt, the lawyer is forced to defend herself and it is her refusal to testify, not the information sought, which becomes the focus of the litigation. By choosing this route the likelihood of ever obtaining the information is foreclosed because review will not come until a conviction after a full trial with all of the inevitable pretrial and posttrial delays. Once formally indicted for Penal Law criminal contempt, the opportunity of purging the contempt is hardly available.
Clearly, the offense Ms. Stewart is charged with is "serious” (Clayton factor "a”), for the prosecutor had information from Ms. Chang that the middle-level distributors (Chang, Maldonado, and Rodriguez) were having their fees paid for by Lincoln, the unindicted higher-up. Furthermore, that Chang may have been mistaken or lying is immaterial. However, as we have seen, the "circumstance of the offense” (Clayton *782 factor "a”) also involved the prosecutor exercising his discretion against a practicing professional who was not charged with any other crime. The prosecution’s choice, without first resorting to other less draconian available alternatives, created a strong likelihood that catastrophic consequences would result — the loss of a respected professional’s license. The circumstances also, as noted above, included an exercise of discretion that may have had the opposite effect of the stated objective, i.e., obtaining information. The circumstances also included criminally (as opposed to civilly) prosecuting a member of the Bar who had litigated (and was prepared to continue to litigate) highly important principles of legal ethics and constitutional law. In many respects Ms. Stewart was treated more like an alleged mobster or one of the drug dealers she represented than an attorney who the prosecutor concedes had done no wrong.
In addition to the seriousness of the offense, the court must consider the "extent of the harm” caused by the offense (Clayton factor "b”). The People are correct that information concerning payment of legal fees to members of the conspiracy by the purported head of that conspiracy might well provide evidence to charge the unindicted boss. At the time the prosecution sought the lawyer subpoenas, the only other available source for this information was Ms. Chang, one of the alleged conspirators (whose evidence would need some corroboration under New York law). However, Ms. Stewart (who is not accused of any involvement with the gang or boss whatsoever) can hardly be held totally accountable for the prosecution’s inability to obtain evidence against "Lincoln”. The People are often deprived of needed evidence by court decisions or constitutional restrictions. Furthermore, the People spent untold hours investigating, recording and taping this alleged gang. Ms. Chang, who had inside knowledge of the boss, was herself released to the streets to gather further evidence and was unable to lead to independent confirmation. Finally, there is now some question of whether Ms. Chang’s claims regarding the fee arrangement were accurate. One of the three attorneys originally subpoenaed before the Grand Jury who presumably was being paid by Lincoln (directly or through Ms. Stewart) told the prosecutor that he was in fact being paid by his client’s wife and brother. The prosecutor accepted that proffer of evidence at face value and that attorney was not called to testify before the Grand Jury.
Does the prosecutor’s course of conduct here amount to *783 "exceptionally serious misconduct of law enforcement personnel in the investigation, arrest and prosecution of the defendant” (Clayton factor "e”)? Obviously not. Nor has the court found "motive” or an attempt to "get” a controversial attorney, as the defense suggests. Given the measured options available to the prosecutor, however, this court can only conclude that the prosecutor acted in a manner that was unfair and in many ways, unjust.
(b) the consequences of a conviction OF CRIMINAL CONTEMPT IN THE FIRST DEGREE
In a technical sense, there is considerable evidence of guilt of criminal contempt in the first degree, the Penal Law felony with which Ms. Stewart is charged (Clayton factor "c”). As noted hereinabove, given the restrictive rules of evidence, there is a strong likelihood she would be convicted as charged. Assuming a conviction, even if this court in its considered judgment determined that the appropriate punishment would be to place her on probation, levy a stiff fine or even conditionally discharge her, she would nevertheless be subject to immediate disbarment pursuant to Judiciary Law § 90 (4) (a). No hearing, no stay, no appeal, no exceptions. There is no requirement that the felony involve theft, deceit, misrepresentation or corruption. Thus, if taken literally, Clayton factor "f” ("the purpose and effect of imposing upon the defendant a sentence authorized for the offense”) would be immaterial to our consideration. It would not matter what sentence this court decided to impose, Ms. Stewart would cease to be an attorney.
Is this result a consideration that alone (or together with other factors) should compel invoking the extraordinary remedy of dismissal? Given the clear legislative intent and important public policy of not allowing convicted felons to practice law, the answer is not self-evident. Thus, Clayton factor "d”, "the history, character and condition of the defendant” becomes particularly relevant here.
The defendant understandably points with particular pride to her long history of representing society’s politically persecuted and economically disadvantaged. It is undisputed that in many instances Ms. Stewart had defended unpopular causes and notorious defendants where no others or few others would step forward. That she chose to labor for the disadvantaged *784 has earned her approbation in some quarters and vilification in others.
This court’s decision, however, cannot and does not turn on Ms. Stewart’s laudable role in providing legal services where they are wanting. This court would and must give the same consideration to a lawyer in Ms. Stewart’s predicament who had built a reputation defending pillars of the establishment or the interests of economic giants. What it does find, however, in reviewing her "history, character and condition” is a dedication to the rule of law and of working to advance that fundamental principle. Can anyone say that Ms. Stewart has conducted herself in other than a decent, principled and trustworthy manner?
There is nothing in the extensive papers before this court to reflect anything but an advocate totally dedicated to the rule of law and to advancing the principle of justice for all. As has been noted throughout, the People do not accuse Ms. Stewart of violating any law other than the contempt section itself. There is no suggestion that she failed or did not intend to pay taxes regarding these legal fees. As long as she did not compromise single-minded devotion to her client, Mr. Maldonado (and no one has suggested she was anything but zealous in his defense), she did not violate any law or disciplinary rule by accepting fees from a third party (see, Code of Professional Responsibility DR 5-107 [A] [22 NYCRR 1200.26 (a)]). Except for her defiant response when being personally served with the Grand Jury subpoena itself, no one has ever suggested that Ms. Stewart has been disrespectful of or to a law enforcement official, adversary or Judge or Justice of this or any court. In many respects, Ms. Stewart is an advocate’s advocate who sought to litigate the previously discussed high and significant principles that clash in the context of this case.
The prosecution’s sincere but somewhat facile response is that Ms. Stewart too had alternatives here, that she made her choice and that she should not now be complaining to this court about the possible untoward but foreseeable consequences. This court cannot agree. There has been no pattern of defiance here or in any other cases brought to the court’s attention. Ms. Stewart did not initiate this confrontation. The consequence of disbarment for this single act of refusing to respond to Grand Jury questions would be catastrophic and irreparable.
The years lost if Ms. Stewart won her appeal (or was *785 eventually reinstated) would be incalculable. And can the People be so confident that their position would be sustained? New York has long been more expansive than other jurisdictions when Sixth Amendment issues are involved. Can the prosecution say with any certainty that their position would or will ultimately prevail? Surely, the Court of Appeals has demonstrated a unique sensitivity to the right of counsel and Ms. Stewart’s position is hardly unworthy of reconsideration. The point is not whether the People or Ms. Stewart is correct but whether Ms. Stewart took a principled position that a vigorous advocate has every right to advance.
(c) THE PROSECUTION’S CHOICE OF GRAND JURY
For several years, the Grand Jury that indicted Ms. Stewart for this essentially technical, albeit serious infraction, heard about million dollar drug conspiracies and, however unsubstantiated, suggestions that Ms. Stewart might consciously or otherwise cause injury or worse to her client Mr. Maldonado, or Ms. Chang. Yet the prosecutor, whose professed interest was to merely obtain the information Ms. Stewart withheld, proceeded to seek an indictment for criminal contempt before this very same Grand Jury.
Were these grand jurors capable of treating fairly a lawyer who was mentioned in the same breath as this evidence of drugs and retribution? Was the prosecutor within his discretion to present the contempt charge to the same jury that heard of drugs and violence?
The argument that the Grand Jury that heard Ms. Stewart’s refusal had to hear the contempt case is disingenuous at best. Perjury indictments are obtained by Grand Juries that do not personally hear the allegedly perjured testimony. Furthermore, speed or convenience could not have been the sole motivating factor, for when the prosecutor had the opportunity to speedily bring Ms. Stewart before Judge Snyder for immediate Judiciary Law contempt, they chose not to do so and indicted her three months later.
The use of the same Grand Jury to hear and weigh Ms. Stewart’s alleged contempt offense as heard the drug and other alleged wrongs of her client and the other alleged drug conspirators was palpably unfair and could not but have prejudiced Ms. Stewart’s ability to get a fair vote from these grand jurors. Ms. Stewart, in their eyes, was preventing the prosecutor from indicting the head of the conspiracy which *786 the Grand Jury had determined existed. The utilization of the same Grand Jury is another relevant fact to be considered on defendant’s Clayton motion (factor "j”).
CONCLUSION
The court has also examined the relevant Clayton factors "g” and "h”. Factor "h”, the safety of the community, warrants little additional consideration here for Ms. Stewart has not been accused of fraud, theft from a client or third party, or corruption, bribery or extortion, and there is little likelihood that this unusual confluence of circumstances will occur again. Ms. Stewart had been accused of no crime when she was called before the Grand Jury. There is no suggestion that she counseled the alleged conspiracy, had a continuing relation with any of its members, or that this was other than a one-time representation of an individual accused. In any event, the public’s welfare is safeguarded as much by fair dealing and vigorous advocacy as it is by aggressive enforcement of a particular law, even one as important as contempt. A similar conclusion can be reached with respect to Clayton factor "g”. The public’s "confidence” in the operation of our criminal justice system can only be enhanced by an understanding that respect for and allegiance to our fragile adversarial process is as important as strict adherence to a particular law or regulation. The public’s confidence in our embattled criminal justice system may well be enhanced by a court’s recognition that compelling human factors may exist in a complex and troubling case, even a case where a court order or directive is disobeyed.
Given all of the facts and circumstances, the court has concluded that the consequences of a conviction would be truly unjust and the court has no alternative but to dismiss the charge. Others can find small comfort in this result for it is unique to the facts and circumstances presented here. There are far more salutary mechanisms and forums for challenging or modifying the prosecution’s practice of issuing Grand Jury subpoenas to lawyers, should sound public policy dictate a different set of standards. However principled, Ms. Stewart’s stand was against the prevailing law, and others would be ill- *787 advised to follow her example. The fact that this court has dismissed this unusual and troubling case is neither a condemnation of the prosecutor nor an endorsement of the conduct of the attorney.