[656 NYS2d 210]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v LYNNE STEWART, Respondent.

First Department, April 8, 1997

### APPEARANCES OF COUNSEL

*Nikki Kowalski* of counsel *(Mark Dwyer* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for appellant.

*Stanley L. Cohen* for respondent.

### OPINION OF THE COURT

Per Curiam.

If a fraud was perpetrated on a court in obtaining a judgment, there is authority for the vacatur of such a judgment (*Matter of Lockett v Juviler*, 65 NY2d 182, 186). In fact, CPL 440.10 (1) and CPLR 5015 (a) (3) specifically provide for such a remedy. That is *not* the case before us. We deal in this matter with a motion pursuant to CPL 210.40 to dismiss an indictment in "furtherance of justice."

Defendant, an attorney, was defense counsel for Dominick Maldonado, one of six persons indicted in a drug conspiracy case. One of the other persons indicted, Susan Chang, who has since died of cancer, cooperated with the prosecution and testified before the Grand Jury that the head of the drug ring had provided lawyers for all the defendants, and that attorney Stewart, the defendant in the instant case, was the drug head's lawyer as well as Maldonado's; the witness also testified that her defense counsel had warned her not to cooperate with the prosecution because the head of the ring would have her killed and that the head of the ring would find out about the cooperation through attorney Stewart, because all the lawyers "go back to Lynne Stewart."

Shortly after the above testimony the prosecution subpoenaed Stewart and two other defense attorneys. Compliance

with the subpoenas would have given the lawyers full transactional immunity (CPL 190.40). Their motion to quash was denied (*Matter of Grand Jury Subpoena of Stewart*, 144 Misc 2d 1012). This Court modified only by staying the subpoenas until the attorneys' representation of the defendants should be terminated, noting that the information sought was neither privileged nor directly incriminatory of their clients but that staying the enforcement of the subpoenas until appellants' representations of the defendants were terminated would ameliorate the "inevitable 'chilling effect' " of the subpoenas (*Matter of Grand Jury Subpoena of Stewart*, 156 AD2d 294).

Maldonado told the court that he wanted a new lawyer but that he was afraid to discharge Stewart because the person who paid her fee was "too smart" and his life and his family's lives would be in danger. The court then appointed another lawyer (shadow counsel) to represent Maldonado in his attempted cooperation. When Stewart became aware of the arrangement, she asked to be relieved. Her application was granted.

The prosecution once again subpoenaed Stewart. She appeared but responded to every question by refusing to answer, on constitutional grounds and on the right of any client of hers, past or present, to absolutely privileged communications with his attorney. Stewart was indicted for criminal contempt in the first degree (Penal Law § 215.51), a class E felony, and moved for an order dismissing the indictment in furtherance of justice (CPL 210.40). Her motion was granted (*People v Stewart*, 158 Misc 2d 776 [portions of opinion omitted]).

Defendant had first moved to dismiss the indictment on the ground that legally sufficient evidence to establish the offense charged had not been presented. The motion court found, however, that legally sufficient evidence had been presented to the Grand Jury. The motion court found further that neither of the legal grounds advanced by defendant—that the prosecutor had improperly charged Penal Law contempt rather than Judiciary Law contempt and that the same Grand Jury that had indicted defendant's client had been improperly used to indict defendant—would independently justify dismissal of the indictment. The court, however, expressly set out to examine and discuss the issues raised by those legal grounds in its examination and consideration of defendant's CPL 210.40 (1) motion.

The motion court, granting the legality of the prosecutor's choice of criminal rather than Judiciary Law contempt, never-

theless felt constrained to ask why the prosecutor chose criminal contempt and whether such choice was just and fair. It then concluded that the prosecutor's choice of criminal contempt all but precluded a review of the appropriateness of Ms. Stewart's question-by-question refusals. But the appropriateness of her refusals is the very question of her guilt or innocence which should be resolved by a trial. CPL 210.40 (1) and its criteria (paras [a]-[j]) rather "present, as a matter of legislative policy, a broad range of considerations *basically unrelated to guilt or innocence*" (Preiser, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 210.40, at 703 [emphasis supplied]).

The motion court conceded that the offense charged is serious and, evidently, that the extent of the harm done might be serious; but it noted, citing the prosecutor's failure to obtain such evidence by other routes, that defendant "can hardly be held totally accountable for the prosecution's inability to obtain evidence against 'Lincoln' (the alleged head of the narcotics ring)." (158 Misc 2d, *supra,* at 782.) The failure to obtain such evidence by other routes, however, made it all the more important that the lone remaining chance or few remaining chances to uncover a drug conspiracy not be thwarted by an improper refusal to testify. And the propriety or impropriety of the refusal should be left for trial, unless there is some "compelling factor" consistent with paragraphs (a) through (j) of CPL 210.40 (1) requiring dismissal (*see,* CPL 210.40 [1]).

The dissent argues that if this Court had been aware that defendant was no longer Maldonado's counsel, its decision on the motion to quash the indictment would have been different and that defendant was "deprived of her strongest arguments in this Court." But, since three members of the panel who elected to stay Ms. Stewart's appearance before the Grand Jury until her representation was terminated nevertheless concluded that "the subpoenas should not be quashed", and the two dissenters would also have denied the motion to quash the subpoena and permitted "immediate testimony" before the Grand Jury (*Matter of Grand Jury Subpoena of Stewart, supra,* at 294), the reasonable conclusion is that the Court would have unanimously directed defendant's immediate testimony before the Grand Jury had it known she was not Maldonado's counsel at that time.

In any event, as noted, we are dealing only with the issue of whether the motion court abused its discretion when it granted defendant's motion to dismiss the indictment in furtherance of justice pursuant to CPL 210.40.

The dissent refers to the "unsettled state of the law" concerning the issuance of Grand Jury subpoenas to defense counsel. However, the Court of Appeals has found that fee arrangements between an attorney and his or her former client and between an attorney and a third party who may have retained the attorney to appear for such client are not protected by the attorney-client privilege (*Matter of Priest v Hennessy*, 51 NY2d 62). "The name of the person retaining an attorney for another and the amount of the retainer paid are quite simply not the confidences which the privilege was intended to protect" (*supra,* at 70). Even if they were, moreover, public policy considerations might in some circumstances still require disclosure (*supra,* at 70-71; *Matter of Jacqueline F.*, 47 NY2d 215). This is *not* "unsettled" law.

CPL 210.40 (1) provides that an indictment or a count thereof may be dismissed in furtherance of justice when "such dismissal is required as a matter of judicial discretion by the existence of some compelling factor, consideration or circumstance clearly demonstrating that conviction or prosecution of the defendant upon such indictment or count would constitute or result in injustice."

In determining whether dismissal is appropriate, 10 factors, lettered (a) to (j) in the statute, must be considered. The first three, (a) to (c), clearly weigh against defendant: (a) the seriousness of the offense and the circumstances in which it was committed, after litigation with respect to her duty to testify and after her client, in terror of the head of the ring, had accepted other counsel to handle his cooperation, are clear and the motion court concedes the seriousness of the offense; (b) the extent of harm caused by it is obvious; no charges were brought against the head of the ring, the only evidence against him before the Grand Jury coming from his accomplices (*see,* CPL 60.22; *People v Breland*, 83 NY2d 286); it seems that the motion court concedes the extent of the harm caused but concludes that defendant is not "totally accountable" (158 Misc 2d, *supra,* at 782) for it; and (c) the evidence of her guilt of violating Penal Law § 215.51 is strong, and the motion court concedes that it is strong. Factors (e) to (h) also weigh against defendant: (e) there has been no misconduct by law enforcement personnel as the motion court concedes; (f) the purpose of the indictment and of the prescribed sentence was to get defendant to testify, though its success could not be guaranteed; dismissal would defeat that purpose; the argument that a milder sanction might have been more effective is unconvincing; (g)

the impact of dismissal of the charge against a lawyer on the ground that disbarment is too harsh a penalty, a ground not available to a layperson, could only injure public confidence in the criminal justice system; and (h) the impact of the dismissal upon the safety of the community would be adverse in that it would serve to perpetuate similar layerings of knowledge in similar situations.

Factor (d) is "the history, character and condition of the defendant." There is nothing in her history, character, or condition which would militate for or against the dismissal of the indictment. Factor (i), the attitude of the complainant, and factor (j), any indication that a judgment of conviction would serve no purpose, would seem not to come into play.

All in all, examining and considering the factors set out in CPL 210.40 (1), as we must, there has been no indication of "the existence of some *compelling* factor, consideration or circumstance *clearly demonstrating* that conviction or prosecution of the defendant * * * would constitute or result in injustice" (CPL 210.40 [1]; emphasis supplied). What has been clearly demonstrated is that the offense with which defendant is charged is a serious and harmful one and that the criteria prescribed in CPL 210.40 (1) indicate that dismissal in furtherance of justice is inappropriate.

The argument that the People's seeking a contempt indictment from the same Grand Jury before which Stewart had refused to testify was improper is without merit. Another Grand Jury would have had access to a transcript showing what this Grand Jury, instead, had observed. Either way, the essential fact, Stewart's refusal to testify, would have been shown (*see, Langella v Commissioner of Corrections, State of N. Y.*, 413 F Supp 1214, 1219 [SD NY], *affd* 545 F2d 818 [2d Cir], *cert denied* 430 US 983).

If she is convicted of the felony of criminal contempt, defendant will be automatically disbarred (Judiciary Law § 90 [4] [a]). This is a consequence she understood when she refused to testify, a consequence she was reminded of by the prosecutor. Laypersons who commit felonies suffer the consequences. Lawyers who commit felonies should not be allowed to avoid the consequences, even though they include disbarment. This Court has recognized that there may be unusual circumstances under which a mandated sentence may be so disproportionate to culpability as to support dismissal pursuant to CPL 210.40 (*see, People v Cruz*, 114 AD2d 769, 771). Mandated collateral consequences of a conviction could, it would seem, similarly

justify dismissal. The focus on the administrative consequences to defendant in the instant case, however, must not be allowed to obscure the interest of the State (*see, People v Naik*, 139 AD2d 535). In *People v Cruz (supra)*, this Court found that the conclusion was almost inescapable that defendant was a habitual criminal and that dismissal of any count to avoid the prescribed sentence was improper. In the instant case, defendant insists, in effect, that *Matter of Priest v Hennessy (supra)* does not apply to her; the consequences of her silence preclude the dismissal of the indictment.

The memorandum of the New York State Association of Criminal Defense Lawyers, appearing as *amicus curiae*, stresses the argument that defendant's course of action was proper. We are concerned, however, with CPL 210.40 (1) and criteria (a) through (j) therein, which, as has been observed, "present, as a matter of legislative policy, a broad range of considerations *basically unrelated to guilt or innocence*" (Preiser, *op. cit.;* emphasis supplied). Only factor (c) refers to the evidence of guilt. Since there is no showing that this is the " 'rare' " and " 'unusual' " case crying out for " 'fundamental justice beyond the confines of conventional considerations [citations omitted]' " (*People v Insignares*, 109 AD2d 221, 234, *lv denied* 65 NY2d 928), defendant's guilt or innocence should be decided after a trial. There is an incongruity in arguing the question of guilt or innocence at such length in an attempt to avoid the process which determines guilt or innocence. "Before the function of the jury, the Judge and the very trial itself is supplanted, an overriding moral issue must be present so as to utilize this extraordinary procedure requested herein" (*People v Stern*, 83 Misc 2d 935, 940). The overriding moral issue here supports the position of the People.

What defendant seeks here is analogous to what was sought by the defendant in *People v Stein* (85 Misc 2d 1081 [Sup Ct, Suffolk County]) 21 years ago. Stein, a student at the State University at Stony Brook, had received and opened a package mailed from Nepal and under surveillance since it entered the country. It contained marihuana and opium. Testifying that he had not ordered the package, was unaware of its contents, never intended to exercise dominion and control over it, and had opened it only out of curiosity, he moved for dismissal in the interests of justice. The court observed that Stein might indeed be able to establish his innocence but that he had not met the standards of *People v Clayton* (41 AD2d 204) and that "[t]he defendant really seeks summary judgment in this crimi-

nal matter through the vehicle of a motion for dismissal in the interests of justice. No such remedy is available to him." (*People v Stein, supra,* at 1082-1083.) Similarly, no "summary judgment" dismissing the indictment is available to defendant in the instant case, whether or not she may be able to avoid conviction otherwise. Indeed, it would seem that the dissent was dictated by an attempt to secure summary judgment and to "deny to the People the opportunity to offer their proof" (*supra,* at 1082).

The motion court, in referring to the criteria of CPL 210.40 (1), relied on (d), the history and character of the defendant; on (f), the purpose and effect, including the catastrophic collateral effect of disbarment, of imposing the authorized sentence on defendant; and on (j), the utilization of the same Grand Jury, as indicating that a judgment of conviction would serve no useful purpose. The State's purpose in imposing the authorized sentence, however, is to induce people not to refuse to answer questions. As indicated above, the State has a legitimate purpose in doing so. The motion court's conclusion that the utilization of the same Grand Jury indicates that a judgment of conviction would serve no useful purpose pursuant to factor (j) is without justification or logic. Thus, all that is left not favoring reversal here is criterion (d), her history, character, and condition. That factor does not of itself satisfy the requirement of CPL 210.40 (1) for "some compelling factor, consideration or circumstance clearly demonstrating that conviction or prosecution of the defendant * * * would constitute or result in injustice" (*compare, People v Colon,* 86 NY2d 861).

The dissent recognizes that the court's power to dismiss in furtherance of justice is "now exercised pursuant to statute" but emphasizes that that power has long been recognized by the common law and *fails* to examine the criteria of CPL 210.40 (1), contrary to the dictates of *People v Colon (supra).* Instead, it goes on to recite factual accounts which have little if anything to do with the statutory scheme; to challenge the discretion of the prosecutor; to trace the appellate history of earlier motions in the case even if only tenuously related; to argue the inherent illegality of the procedure of using "shadow counsel" and the impropriety of the subpoena itself; and to disparage Maldonado's fears.

Though highly critical of the prosecution and the Supreme Court and expressing concern about Maldonado's right to counsel, the dissent offers no alternative to the concealment of the new counsel for the purpose of allaying Maldonado's

expressed fears of retribution from Lincoln and preventing such retribution. The Grand Jury subpoena, though seeking testimony and documentation with respect to the payment of defendant's fees for defending Maldonado, was clearly aimed at Lincoln and not Maldonado. The dissent, nevertheless, in its condemnation of secret counsel, would hinder the ability of the People to protect possible witnesses and to investigate and expose possibly criminal participation by attorneys in furtherance of the drug trade.

In any event, this issue is *not* one properly before us. If defendant is aggrieved by the "manner" in which the prior appeal was decided, she can move to vacate any order or judgment obtained by fraud or misrepresentation. "Courts traditionally have inherent power to vacate orders and judgments obtained by fraud or misrepresentation. In this State, that power has been exercised in civil cases *(Furman v Furman*, 153 NY 309; *Matter of Holden*, 271 NY 212) and criminal cases *(Matter of Lyons v Goldstein*, 290 NY 19)" *(Matter of Lockett v Juviler*, 65 NY2d 182, 186, *supra)*. Defendant can raise the issue in her trial and if not vindicated by a trier of the facts can move pursuant to CPL 440.10 to vacate that judgment. In fact, accepting the facts as given by the dissent as true, there appears to be no reason defendant cannot move pursuant to that section with respect to the prior judgment affirmed by us. Thus, CPL 440.10 (1) reads, in pertinent part: "At any time after the entry of a judgment, the court in which it was entered may, upon motion of the defendant, vacate such judgment upon the ground that * * * (b) The judgment was procured by duress, misrepresentation or fraud on the part of the court or a prosecutor or a person acting for or in behalf of a court or a prosecutor".

Likewise, CPLR 5015 (a) (3) provides that: "The court which rendered a judgment or order may relieve a party from it upon such terms as may be just * * * upon the ground of * * * fraud, misrepresentation, or other misconduct of an adverse party".

Had defendant moved in such a manner, the People would have the opportunity to be heard, especially the allegations dehors the record relied upon by the dissent, and to contest its unilateral fact-finding. The dissent accuses us of dispensing with the consideration of factor (e) in CPL 210.40 (1), "any exceptionally serious misconduct of law enforcement personnel in the * * * prosecution of the defendant." The dissent attacks the use of shadow counsel, the ethics of the prosecution *and*

the court in obtaining and using such counsel. However, the dissent conveniently does not cite to *one* case which makes the use of "shadow counsel" illegal or a breach of ethics. We will *not*, as does the dissent, so cavalierly castigate the prosecutor and the court for attempting to discover the inner workings of a drug ring and protect an informer. We will not rely solely upon speculation and surmise, outside the record, to issue a holding. Once again, we reiterate, this is *not* the function of the statute now before us, which allows dismissals in further-ance of justice, and we refer to the cases cited above where the Court of Appeals has reversed the application of this statute to cases which did *not* fit within the statutory framework of CPL 210.40. This is such a case.

While we will not respond in kind to the dissent's addendum, we must note that, in over 50 pages, the dissent charges this Bench with cooperating in the alleged "derogation" of ethics engaged in by the narcotics prosecutor, and accuses us of using the criteria of CPL 210.40 as a "blind" to screen from view aspects of the record which are "highly disquieting."

Judge Cardozo observed many years ago that "A Judge is not a knight-errant, roaming at will in pursuit of his (or her) own ideal of beauty or of goodness" (Cardozo, The Nature of the Judicial Process, reprinted in Selected Writings of Benjamin Nathan Cardozo, at 164 [Hall ed 1947]). The dissent, however, instead of focusing and dealing with the issue before us, takes up and deals with other issues, fascinating, no doubt, but *not* before us.

Finally, our disagreement with the motion court is only with respect to its application of the statutory criteria for dismissal of the indictment in the furtherance of justice. That we dis-agree with the motion court in this regard in no way affects our respect for its courage, integrity and intellectual prowess. In fact, the dissent would have done well to have simply relied upon the motion court's opinion.

Accordingly, the order of the Supreme Court, New York County (Richard T. Andrias, J.), entered on or about May 18, 1993, which granted defendant's motion to dismiss the indict-ment in furtherance of justice, should be reversed, on the law and on the facts, the motion denied, and the indictment reinstated.

MURPHY, P. J. (dissenting). It is ordinarily the prerogative of the prosecutor to decide whether to prosecute an individual for crime, the only general limitation upon that prerogative being

the Grand Jury's power to refuse to vote an indictment when the evidence before it is either legally insufficient to support the proposed charge, or, in the Grand Jury's view, not reasonably supportive of the accusation the prosecutor would make (*see*, CPL 190.75). The subject prosecutorial prerogative, however, while undeniably broad, is not otherwise unlimited. Indeed, the law recognizes that there are exceptional cases in which prosecution, even though proper in a technical sense, does not advance the cause of justice and, in such cases, the court is vested with equitable power, long recognized by the common law but now exercised pursuant to statute, authorizing it to dismiss an indictment "in furtherance of justice" (CPL 210.40). Of course, there is a heavy presumption that justice will, in fact, be served by the diligent prosecution of a duly indicted defendant. Accordingly, a contrary conclusion may be reached by a court only upon a showing of some compelling circumstance by reason of which a case may be said to "cr[y] out for fundamental justice beyond the confines of conventional considerations of 'legal or factual merits of the charge or even on the guilt or innocence of the defendant' " (*People v Belge*, 41 NY2d 60, 62-63 [Fuchsberg, J., concurring]; *People v Perez*, 156 AD2d 7, *lv denied* 76 NY2d 794; *People v Howard*, 151 AD2d 253, *lv denied* 74 NY2d 811; *People v Diggs*, 125 AD2d 189; *People v Insignares*, 109 AD2d 221, *lv denied* 65 NY2d 928). This is such a case.

The very unusual circumstances out of which the within prosecution and instant motion for its dismissal arise date back to 1989. On July fifth of that year, the defendant, Ms. Lynne Stewart, an attorney, was served with a Grand Jury subpoena requiring her to testify and produce documentation respecting the source of her fees for the representation of one Dominick Maldonado. At the time she was subpoenaed, Ms. Stewart had been representing Maldonado for some four months; she was defending him against charges contained in a then-32-count indictment alleging that Maldonado and five codefendants had committed various narcotics-related offenses during and in furtherance of an extensive conspiracy to market heroin on the lower east side of Manhattan. The Grand Jury that subpoenaed Ms. Stewart was the same Grand Jury that had indicted her client, Maldonado, and the subpoena was issued purportedly to widen the scope of that same Grand Jury's still ongoing investigation into the conspiracy of which Maldonado had allegedly been part. Indeed, quite apart from its issuance of the subpoena to Ms. Stewart, the continuing

and increasingly broad investigative focus of the Grand Jury upon the lower east side drug conspiracy was made evident by the Grand Jury's return on July 19, 1989 of a superseding indictment adding five defendants and 20 counts to those already covered by the original 32-count accusatory instrument. Among the newly indicted defendants was one Luis Torres, alleged to be second in command of the narcotics conspiracy. Torres had been arrested in early June 1989, at which time numerous documents bearing upon the operations of the drug ring had also been seized. Since his arrest, Torres had been cooperating with the prosecution, a circumstance which the narcotics prosecutor, seeking leverage in plea negotiations, readily divulged to Ms. Stewart and counsel for the other defendants; although, prior to Torres' arrest and cooperation, the prosecution had indicated a willingness to agree to relatively favorable dispositions in exchange for cooperation, the prosecutor's position now, subsequent to Torres' much-vaunted cooperation, was that the defendants who had not yet cooperated would either plead to the top count in the indictment and receive minimum prison terms of 15 years or go to trial and risk the consequences.

This hardening of the narcotics prosecutor's bargaining position occurred even though the conspiracy's alleged leader, Robert Cruz, also known as "Lincoln", remained unapprehended and unindicted; the prosecutor apparently felt that the remaining evidence necessary to indict Cruz could and would be obtained not from Cruz's indicted coconspirators but rather from their attorneys, and it was for the purpose of eliciting such evidence that Ms. Stewart, along with cocounsel David Weiss and Christopher Lynn,[1] was subpoenaed in early July 1989. Indeed, the theory of relevance underlying the subpoenas' demands for fee information was that such information, if furnished by defense counsel, could provide the nonaccomplice corroboration necessary (see, CPL 60.22, 190.30) to indict Cruz for his role in the drug conspiracy; by the time it subpoenaed Ms. Stewart and cocounsel, the Grand Jury had heard testimony from one of Maldonado's codefendants, Susan Chang, to the effect that Cruz was the leader of the drug ring and that it had been understood that Cruz would provide counsel to his lieutenants if they were apprehended for offenses committed in furtherance of the conspiracy. The narcotics prosecutor

---

1. At the time he was subpoenaed, Weiss was nominal counsel (see, infra) to Maldonado's codefendant Susan Chang; Lynn represented codefendant Jaris Rodriguez.

believed, in reliance on Chang's testimony, that the clients of the subpoenaed attorneys were beneficiaries of this allegedly conspiratorial understanding with Cruz, and now sought to elicit confirmation of that state of affairs from the attorneys themselves.

Ms. Stewart and the other subpoenaed attorneys moved to quash the subpoenas. In this connection, they urged that the subpoenas were, in their issuance and the information they sought to elicit, violative of the right to the assistance of counsel as guaranteed by Federal and State Constitutions and of the attorney-client privilege. It was also alleged that service of the subpoenas upon defense counsel in the above-described circumstances constituted an abuse of process. In a lengthy opinion, Justice Snyder, who was also presiding over the pretrial proceedings in connection with the Maldonado indictment[2], denied the motion. She found the cases, both Federal and State, delimiting the scope of the attorney-client privilege decisively contrary to defense counsel's claim that the subpoenaed fee information fell within the privilege. Somewhat more troublesome to Justice Snyder, however, if ultimately no more meritorious, was that branch of the motion predicated upon the subpoenas' alleged infringement on the right to counsel. She stated:

"It is clear that whenever an attorney is compelled to testify in the Grand Jury, the attorney may well be placed in the position of becoming a witness against the client or risking contempt. Under these circumstances, it would be ludicrous for any court to ignore the potential 'chilling effect' that a Grand Jury subpoena to counsel has on the attorney-client relationship.

"Given the historical importance of the Sixth Amendment right to counsel, as preserved and maintained by our Court of Appeals and as applicable in the postindictment situation here, it is necessary to balance the rights and powers of the Grand Jury with the defendants' right to counsel of their choice." (*Matter of Grand Jury Subpoena of Stewart*, 144 Misc 2d 1012, 1023.)

---

2. Although Judge George Roberts had been supervising the Grand Jury and had been presiding over the proceedings in connection with the motion to quash, it appears that he was on vacation on the motion's return date and that, in his absence, the narcotics prosecutor "suggested" to the Judge filling in for him that the motion be transferred to Justice Snyder because of her familiarity with the underlying criminal matters. The prosecutor's "suggestion", apparently made ex parte, was evidently followed and the subpoena litigation was sent out to Justice Snyder.

To accomplish this balancing, Justice Snyder, noting the absence of appellate guidance as to precisely how the competing interests were to be weighed, prescribed her own tripartite test: for a subpoena such as the one served upon Ms. Stewart to pass constitutional muster, the subpoenaed evidence had (1) to be reasonably believed relevant to the investigation of the Grand Jury; (2) to be sought in good faith; and (3) to be unobtainable from a "reasonable, legally sufficient alternative source" (*supra,* at 1023). Concluding that these criteria had been satisfied, Justice Snyder ordered Ms. Stewart's appearance before the Grand Jury and her production of the subpoenaed documents.

The denial of the motion to quash was thereafter appealed to this Court, which issued its ruling in the matter on December 21, 1989 (156 AD2d 294). Holding, as had the motion court, that the subpoenaed evidence was not privileged, and observing that the fee information sought by the Grand Jury was not "directly incriminatory of appellants' clients" (*supra,* at 294), the Court unanimously concluded that the subpoenas requiring Ms. Stewart's evidence and that of her cocounsel ought not to be quashed. The Bench, however, divided as to the timing of defense counsels' compelled Grand Jury appearances. Noting the "inevitable 'chilling effect' that the very summoning of appellants before the Grand Jury has on their relationships with their clients [citations omitted]", the three Justice majority directed that enforcement of the subpoenas be stayed "until appellants' representations of defendants in the proceeding bearing indictment number 8329/89 are terminated" (*supra,* at 294). Dissenting from this part of the ruling, Justices Smith and Rubin stressed that "[t]he allegation that the Grand Jury appearance will have a chilling effect is conclusory and without adequate evidentiary support, and under the facts and circumstances of this proceeding must be rejected" (*supra,* at 296).

On January 29, 1990, the People moved in this Court for leave to appeal from that portion of its order staying enforcement of the Grand Jury subpoenas. Upon the motion, the People complained that "grand jury proceedings against the unindicted conspirators have now been delayed by this appeal and the motions underlying it since July, 1989. And there is no apparent prospect of a speedy resolution of the proceedings

against the indicted defendants." The People's motion was granted by order entered February 20, 1990[3] (158 AD2d 1010).

The subpoena litigation proceeded with an air of relative normalcy for the ensuing four months; a briefing and argument schedule was set and jurisdictional statements were filed in the Court of Appeals. In June 1990, however, the litigation abruptly terminated following the compelled disclosure of the startling and, as it turned out, long-pending circumstance, that two of the subpoenaed attorneys, Ms. Stewart and Mr. David Weiss (the latter of whom was the attorney of record for Susan Chang), had, unbeknownst to them, been effectively removed and replaced as counsel to their indicted clients.

It seems that Ms. Chang, who had been cooperating with the prosecution since relatively early in the case and whose cooperation, in addition to the above-described Grand Jury testimony, included her utilization as a registered informant, became ill with terminal cancer in the spring of 1990. Believing that Ms. Chang would not survive until the trial, the prosecution sought to preserve her testimony. A conditional examination of Chang was, accordingly, scheduled[4] and, in preparation for Chang's cross-examination, the defendants sought disclosure of all *Rosario* material. The prosecution responded by moving to limit the scope of its otherwise mandated disclosure obligation, but Justice Andrias, to whom the proceedings in connection with the conditional examination had been referred, denied the motion and directed that the mandated disclosure be made without exception. The materials thus made available to the defense revealed not only that Chang had been cooperating with the prosecution virtually since its inception, but that her nominal counsel of record, David Weiss, had long since been displaced by "shadow

---

3. The stay of the subpoena's enforcement, however, was expressly continued.

4. Although scheduled, it is unclear from the instant record whether a conditional examination of Chang, who was seriously ill and died in early 1991, was ever actually conducted. It does, however, appear clear that Ms. Stewart and the other defense counsel subpoenaed on the strength of Ms. Chang's allegations before the Grand Jury never had the opportunity to cross-examine Chang as to those allegations. As is explained *infra*, Ms. Stewart and the other subpoenaed attorneys ceased to act as defense counsel in the drug conspiracy prosecution by reason of events and disclosures occurring before any conditional examination could be held.

counsel",[5] brought into the case by Justice Snyder precisely to enable Ms. Chang to cooperate without Mr. Weiss, or anyone to whom he may have been beholden,[6] knowing about it. While it was still possible to maintain, this judicially sanctioned and enacted deception proved an elaborate and quite literally duplicitous undertaking. Chang, for example, was led through two plea allocutions—an open mock allocution in which Mr. Weiss acted as Chang's counsel and a secret, true allocution in which the role of Chang's attorney was filled by "shadow counsel". She was similarly "sentenced" and "resentenced". Nor, even in its earliest stages, did the parallel subpoena litigation remain immune from such dissimulation; Justice Snyder decided the motion to quash as if Weiss were still Chang's attorney when, in fact, as both the court and narcotics prosecutor knew, Weiss had already been replaced by "shadow counsel".[7]

As for Ms. Stewart's client, Maldonado, the materials Justice Andrias ordered turned over to the defense showed that he, too, had been cooperating with the prosecution and, like Chang, had been appointed "shadow counsel".

It appears that Maldonado telephoned an Assistant District Attorney, Eric Herschman, on November 9, 1989.[8] He stated in essence that he wanted to talk to Herschman but did not want Ms. Stewart to know that he was doing so. Herschman replied that Maldonado would need to have a lawyer present in order to communicate with the prosecution and suggested that Maldonado explain to Justice Snyder why he did not want Ms.

---

5. Indeed, even as he filed his motion to quash, Weiss had already been removed as Chang's attorney. The record indicates that as early in the prosecution as July 5, 1989—the date upon which Ms. Chang testified before the Grand Jury and, coincidentally, upon which the first of the attorney subpoenas was served—Ms. Chang was represented by an attorney other than Weiss.

6. Chang told the Grand Jury that when she broached the subject of cooperation with Weiss, Weiss stated that, if she cooperated, "Lincoln" would find out about it from Lynne Stewart and have her killed. When asked how Ms. Stewart would learn of her cooperation, Chang replied simply, "All the lawyers go back to Lynne Stewart."

7. As noted, it is clear from the present appellate record that, at least as early as her Grand Jury appearance of July 5, 1989, Chang was being represented by an attorney other than Weiss; yet, Justice Snyder's decision on the motion to quash, purporting, inter alia, to balance Weiss's obligations vis-à-vis the Grand Jury against his duty to his client, putatively Chang, was issued on August 3, 1989.

8. This and the subsequent telephone conversations between Maldonado and Herschman were tape recorded and transcribed; the transcripts are found in the appellate record.

Stewart to represent him: "What has to be done though is you have to explain it to the judge, and then she'll get you a lawyer.[9] The court will appoint one for you, but it will be between you and her, alright?" Maldonado agreed to call Herschman back with his answer and, on November 13, 1989, did so, indicating that he would like to see the Judge.

Maldonado was brought before Justice Snyder on November 16, 1989. Attending, in addition to the Judge and Maldonado, were Herschman, a criminal defense attorney named Harold Schwartz, whose presence had been requested by Justice Snyder to facilitate Maldonado's anticipated cooperation, several law enforcement officers and the Grand Jury stenographer.[10] Maldonado indicated that he wished to cooperate with the prosecution without his lawyer knowing about it, and, as matters progressed, it became evident that Maldonado was, in effect, asking that he be allowed to cooperate with the assistance of a court-appointed lawyer while affecting to continue his representational arrangement with Ms. Stewart, the purpose of the pretense being to keep Ms. Stewart in the dark as to the fact of his cooperation. Recognizing the nature of Maldonado's request, the court explained its position: "You can't have another lawyer and keep Miss Stewart unless there is some reason, some overwhelming reason, you can't fire Miss Stewart. That is what—why we are here. * * * That's the impression you have given the District Attorney. That is why I am here, is that you can't tell Miss Stewart she is fired because you were afraid to tell her and you wanted me to appoint another attorney to represent you without her knowing it so you can speak to the District Attorney." Notwithstanding the invitation to do so, however, Maldonado either would not or could not articulate any reason, "overwhelming" or otherwise, to support his most unusual request. The meeting then concluded with the court setting forth the terms of its future involvement: "The only reason I will speak to you again is if you have decided that you don't want your present attorney, Miss Stewart, and you want to cooperate, and you want me to assign one

9. One can only gather from this extraordinary representation that there was at the time of Maldonado's overture to Herschman already some protocol in place for secret substitution of counsel. It is, of course, clear that substitution of counsel had already been covertly effected on at least one prior instance (in Ms. Chang's case), and one must wonder whether the device of secret substitution was not otherwise unprecedented and, if it was not, with what frequency it was being used.

10. Herschman was apparently of the view that the regular court reporter could not be trusted to keep the in camera proceedings secret.

for you, or you can't fire your present lawyer and you are willing to put all the reasons on the record, and then I'll assign someone to you or Mr. Schwartz to represent you. This is something I do not like and would only do if you have convinced me that you are in fear for your life if she knows about it."

Only five days passed before Maldonado decided that he would like to speak to Justice Snyder again. He, accordingly, telephoned Herschman on November 21, 1989, and asked that Herschman arrange a second meeting with her. Herschman agreed to try but emphasized that Maldonado would have to be prepared to explain "everything". Maldonado then, undeterred, if not encouraged, by Herschman, proceeded to explain "everything" directly to the prosecutor:

"DOMINICK: O.K., but, uh, listen, another thing, ah, it's see the reason what I want is to for her to stay on the case is because this guy paid her.

"A.D.A. HERSCHMAN: Cause what?

"DOMINICK: The, the guy * * *

"A.D.A. HERSCHMAN: Right.

"DOMINICK: Paid her.

"A.D.A. HERSCHMAN: I didn't hear what you said.

"DOMINICK: You know, for ah, to be my lawyer?

"A.D.A. HERSCHMAN: You want her to be your lawyer?

"DOMINICK: No, see, you don't listen to what I'm saying. You see this other guy paid her * * *.

"A.D.A. HERSCHMAN: Right.

"DOMINICK: * * * to be my lawyer.

"A.D.A. HERSCHMAN: The other guy paid her to be your lawyer?

"DOMINICK: Yeah. So that's the other thing, you know that, that, that if she continued the case, you understand what I'm saying? Can she continue the case, cause like that, he won't get no bad ideas."

Having thus rehearsed his explanation, Maldonado, on November 27, 1989, was returned to Justice Snyder's chambers where, in the presence of the same persons who had attended the earlier meeting, he entered into the following exchange with the court:

"MR. MALDONADO: Your Honor, the reason I don't want to fire Miss Stewart, she was paid by this—another person and this person is too smart, and he will want to know what I am firing her for.

"THE COURT: And?

"MR. MALDONADO: That's the reason why I spoke to the DA. That is—I wouldn't be able to fire the Lawyer for this matter.

"THE COURT: You said he would be too smart, and he would want to know why you wanted another lawyer. Would that result in some problem for you?

"MR. MALDONADO: Yes.

"THE COURT: What? I have to hear. You can't assume that I understand what is on your mind. I want you to spell it out for me, why that would be a problem.

"MR. MALDONADO: Well, the problem would be that I will be—my life will be in danger and so is my family.

"THE COURT: Your family's life too?

"MR. MALDONADO: Yes.

"THE COURT: All right. In that case, Mr. Schwartz, I want you to represent Mr. Maldonado for the purpose of this attempted cooperation."

Justice Snyder then indicated that she realized she was putting Mr. Schwartz in a difficult position but felt that she was acting in accordance with her "ethical responsibility". In the ensuing colloquy, Mr. Schwartz, although agreeing to do as he was bid, politely questioned the propriety, necessity and efficacy of the representation he had been asked to provide:

"MR. SCHWARTZ: Obviously, I'll do what you instruct me to do. I only have one problem. What the defendant is saying is not that he doesn't trust Miss Stewart, but that he feels that the person who paid Miss Stewart will be the wiser if, in fact, he discharges Miss Stewart. And in essence what I'm doing is representing him for this particular procedure, but Miss Stewart is his lawyer and is not going to know about that. And that's what I have difficulty with.

"THE COURT: Mr. Schwartz, I understand what you are saying. It puts me in the same position. And I have no desire to be participating in a procedure which the attorney does not know about. I consider it distasteful. And I have examined all ethical standards[11] that I can find and my conclusion is that, as the Judge, when the defendant makes the kind of statement that this defendant just did about worrying about his life and that of his family's life being in danger which does involve Miss

11. It is not at all clear to which ethical standards the court was referring. There is no citation given to any standard necessitating action such as the court took.

Stewart knowing if he were to cooperate then I feel I have no choice. My ethical responsibility is to appoint you, and I understand it's distasteful. I don't see that I have any other choice."

Then, to clarify for Mr. Schwartz what she understood to be the nature of Ms. Stewart's involvement, Justice Snyder again questioned Maldonado:

"THE COURT: I have to assume in that statement that you are saying, Mr. Maldonado, that this other person would find out—the person who paid Miss Stewart, as you just said—would find out that you had fired Miss Stewart. That's what you just told me.

"MR. MALDONADO: Right.

"THE COURT: And I assume—correct me if I am wrong—that you were saying that Miss Stewart would be telling that person.

"MR. MALDONADO: Well not exactly. What I'm trying to say—he is too smart. He will want to know why I am firing her."

At the conclusion of this inquiry, during which Maldonado stopped conspicuously short of stating that he believed Ms. Stewart would advise his "benefactor" of his decision to cooperate, the court turned to Mr. Schwartz and explained:

"THE COURT: The problem, Mr. Schwartz, is no one at this point is making any judgment about anybody. Its just what Mr. Maldonado is saying is that this person would find out via having paid Miss Stewart because he would want to know what was happening and would learn that Mr. Maldonado is no longer being represented by Miss Stewart if he fired her and that, Mr. Maldonado, is what you told me—you felt you would place your life in danger. Am I right?

"MR. MALDONADO: Yes."

Mr. Schwartz, then, apparently unaware of the lengths to which the court was prepared to go to preserve the secrecy of the representational change, made the following cogent observation: "MR. SCHWARTZ: Of course, he [Maldonado's benefactor] could find out by just seeing another attorney appear for him or by other defendants. I don't think that he is saying Miss Stewart would be the one to tell this person—I mean the person—whoever he is we are talking about. I don't even know the person he is talking about. The person he indicates paid for his counsel would find out through any source, possibly a co-defendant, somebody who is in court and seeing Miss Stew-

art is not defending him." The point, of course, made by Mr. Schwartz was that, based upon what Maldonado had said, both on the record and in conference with him privately,[12] Ms. Stewart was not the problem—Maldonado apparently did not distrust her any more or less than anyone else. Moreover, to the extent that Maldonado and the court apparently shared the belief that replacing Ms. Stewart would reduce the danger of cooperating, they were doubtless mistaken since, regardless of the manner in which the replacement was accomplished, it could not be kept secret indefinitely. His misgivings notwithstanding, however, Mr. Schwartz, after an off-the-record discussion in the course of which he was presumably advised by the narcotics prosecutor and the court of their joint design for concealing Maldonado's cooperation, did as the court wished and counseled Maldonado respecting his impending cooperation to the extent of advising him that he, Schwartz, took no position as to whether Maldonado should or should not cooperate and that no promises were being made in exchange for his cooperation. Thus advised, Maldonado went ahead with his decision to cooperate and was debriefed, without Schwartz's further assistance, by the Assistant District Attorney. He apparently had little of value to tell the prosecutor, for in December 1990, upon his conviction, after trial, of numerous narcotics-related crimes, he was sentenced to a prison term of 100 years to life.

When the above-recounted events of November 1989 were finally disclosed to Ms. Stewart in June 1990, some seven months after the fact, she did no more than acknowledge the abiding reality by moving to be officially relieved as Dominick Maldonado's counsel. The motion was, of course, granted.

With the disclosure and clarification of Ms. Stewart's true representational status, it became apparent that the People's appeal to the Court of Appeals had been mooted; the stay upon Ms. Stewart's Grand Jury testimony, conditioned, as it had been by this Court, on the existence of an underlying representational relationship with one of the indictees, was no longer in effect and Ms. Stewart's testimony could now proceed without further appellate litigation over the stay's validity. Ac-

---

12.   During the November 16, 1989 meeting in Justice Snyder's chambers, Schwartz, after conferring privately with Maldonado, reported: "the defendant indicates to me in so many words that he really has no reason to believe that anything would occur if, in fact, he would cooperate with the District Attorney or would be told to any other person. His last words to me were, basically, that he wanted to speak with Miss Stewart about that."

cordingly, the People moved to withdraw their appeal, and, following the grant of the motion in November 1990 (76 NY2d 948), arranged for Ms. Stewart to appear before the Grand Jury on January 18, 1991. Ms. Stewart appeared at the appointed time and to each question posed by the prosecutor responded: "Mr. [Prosecutor], with all due respect for the grand jury and its function, I refuse to answer based upon my rights under the United States Constitution and the New York Constitution. I further believe that I must assert the right of any client of mine, past and present, to absolutely privileged communications with his or her attorney. I further believe that this subpoena constitutes an abuse of the grand jury's legal function."

The prosecutor then instructed Ms. Stewart that she was not a target of the Grand Jury's investigation and that she would, in any case, receive immunity from prosecution for any transactions to which she testified. He also advised her, however, that she risked conviction for contempt if she refused to testify and, in that connection, read her the definition of criminal contempt in the first degree (Penal Law § 215.51). Thus instructed, Ms. Stewart returned to the Grand Jury room where she again refused to answer, responding to each question, as she had earlier, by reading the aforecited statement. Ms. Stewart was thereupon brought before the ubiquitous Justice Snyder who, after hearing what had transpired, expressed the view that "this entire subpoena matter has been fully adjudicated" and, given what she took to be the settled nature of Ms. Stewart's testimonial obligation, ordered her to answer. Justice Snyder then advised the parties pointedly of her continuing availability:

"THE COURT: I will remain in session. * * *

"It seems to me that the consequences of failing to obey a lawful order of this Court should be obvious to you [Ms. Stewart], and it would be with great reluctance that I would consider imposing such consequences. But you may put me in a position where I have no choice."

On returning to the presence of the Grand Jury, Ms. Stewart again refused to answer, as she had previously. She was then simply excused; despite its much vaunted availability, further judicial intervention was not sought that day by the prosecutor. Indeed, it was not until nearly four months later that the consequences of Ms. Stewart's testimonial refusal were visited upon her; on April 9, 1991, Ms. Stewart was advised that she had been indicted for criminal contempt in the first degree, a

felony. She was arraigned on the one-count indictment on April 17, 1991. The indictment was returned by the same Grand Jury before which Ms. Stewart had refused to testify—the Grand Jury which over the course of the preceding more than two years had heard all the presented evidence of the lower east side drug conspiracy. Ms. Stewart made the within motion to dismiss the indictment, pursuant to CPL 210.40, "in furtherance of justice", in May 1992.

In his decision of May 1993, granting the motion and directing dismissal of the indictment (158 Misc 2d 776) Justice Andrias meticulously and tactfully considered each of the applicable factors set forth in the statute (see, CPL 210.40 [1] [a]-[j]). As is here relevant, he concluded that although the offense charged was a serious one and the proof of it, at least in a technical sense, strong, there remained important and ultimately predominant countervailing equities. Foremost among these was the circumstance that despite all of the litigation over the validity of the subpoenas issued to Ms. Stewart and cocounsel, the essential and very difficult underlying questions as to the constitutional and ethical propriety of compelling defense counsel to testify before a Grand Jury actively investigating matters in which their indicted clients were implicated remained unresolved. In the absence of authority providing more definitive guidance as to the manner in which the constitutional guarantee of a criminal defendant's right to the assistance of counsel was to be reconciled with the apparently conflicting assertion by the Grand Jury of its right to the evidence of defense counsel, Ms. Stewart's position was, in the court's view, far from frivolous and her principled adherence to that position, even in the face of a court order requiring inconsistent action, ought not to have been treated as felonious. If permitted to stand, the felony charge created a situation in which Ms. Stewart would, in the event of conviction, suffer, in addition to any criminal penalties imposed, automatic disbarment, and that was a consequence which the court deemed disproportionately harsh, not only because Ms. Stewart's testimonial refusal had been premised on arguably meritorious principle, but because, on the record before the court, that refusal stood alone as a solitary act of defiance in a career otherwise characterized by unwavering dedication to the rule of law. The exercise of prosecutorial discretion permitting, indeed actively seeking, such an inequitable outcome was all the more to be condemned because the narcotics prosecutor had had the option of attempting to coerce Ms. Stewart's

compliance with the subpoena by seeking sanctions for civil contempt. That course, foreclosed by the indictment for felony contempt,[13] would not only have avoided placing Ms. Stewart in jeopardy of the catastrophic and largely irreparable professional consequences of a conviction for criminal contempt, but would, as well, have been more likely productive of the evidence the Grand Jury had sought. It would also have afforded Ms. Stewart greater latitude to litigate the legality of her specific testimonial refusals. In this connection, Justice Andrias observed: "The Penal Law route chosen by the prosecutor, while legal in a technical sense, all but precluded a review of the appropriateness of Ms. Stewart's question-by-question refusals. With Judiciary Law contempt, the witness could have been confined while the issue was heard by higher courts on an expedited basis (or the jailing could have been stayed briefly for an appellate review). However, with Penal Law contempt, the lawyer is forced to defend herself and it is her refusal to testify, not the information sought, which becomes the focus of the litigation. By choosing this route the likelihood of ever obtaining the information is foreclosed because review will not come until a conviction after a full trial with all of the inevitable pretrial and posttrial delays. Once formally indicted for Penal Law criminal contempt, the opportunity of purging the contempt is hardly available" (158 Misc 2d 776, 781, *supra*).

A final factor cited by Justice Andrias in support of his decision to dismiss the indictment was the narcotics prosecutor's decision to seek an indictment against Ms. Stewart from the very same Grand Jury that had witnessed her alleged contempt and had heard all of the evidence upon which the indictment of her client and his codefendants in the underlying drug conspiracy prosecution had been based. In this connection Justice Andrias noted perceptively (*supra,* at 785-786):

"For several years, the Grand Jury that indicted Ms. Stewart for this essentially technical, *albeit* serious infraction, heard about million dollar drug conspiracies and, however unsubstantiated, suggestions that Ms. Stewart might consciously or otherwise cause injury or worse to her client Mr. Maldonado, or Ms. Chang. Yet the prosecutor, whose professed interest was to merely obtain the information Ms. Stewart withheld, proceeded to seek an indictment for criminal contempt before this very same Grand Jury.

---

**13.** Felony contempt, once charged, is, in sharp contrast to civil contempt, nonpurgeable (*People v Leone*, 44 NY2d 315).

"Were these grand jurors capable of treating fairly a lawyer who was mentioned in the same breath as this evidence of drugs and retribution? Was the prosecutor within his discretion to present the contempt charge to the same jury that heard of drugs and violence? * * *

"The use of the same Grand Jury to hear and weigh Ms. Stewart's alleged contempt offense as heard the drug and other alleged wrongs of her client and the other alleged drug conspirators was palpably unfair and could not but have prejudiced Ms. Stewart's ability to get a fair vote from these grand jurors. Ms. Stewart, in their eyes, was preventing the prosecutor from indicting the head of the conspiracy which the Grand Jury had determined existed."[14]

Although I agree with Justice Andrias that a fair exercise of prosecutorial discretion would not have permitted the prosecution of an attorney for felony contempt in circumstances where the alleged contempt resulted from the attorney's adherence to a principled and quite possibly meritorious position, and where prior resort by the prosecutor to readily available civil contempt sanctions might well have been more productive both of the evidence assertedly sought and of a full and final determination of the underlying issues, there are I believe other, even more compelling reasons why prosecution of the subject indictment would not be just.

An attorney served with a subpoena requiring her to give evidence to a Grand Jury investigating matters in which her client is implicated and for which he has, in fact, already been indicted, is entitled, in responding to the subpoena, to be kept apprised of the status of the attorney-client relation. This proposition, which I would have thought self-evident[15] as a matter of due process and basic ethical precept, and whose truth I can-

---

**14.** To be contrasted with Justice Andrias' detailed and insightful appreciation of the highly unusual circumstances attending the Grand Jury's consideration of the contempt charge lodged against Ms. Stewart, is the majority's practically peremptory dismissal of the claim that the prosecutor's choice of Grand Juries was unfair and, under all the circumstances, improper. While, as the majority observes, "[a]nother Grand Jury would have had access to a transcript showing what this Grand Jury, instead, had observed," there is still a huge difference between reviewing a transcript of a witness's isolated refusals to answer a prosecutor's questions and witnessing that refusal, as the Grand Jury did here, in the context of its own two-year-long investigation of the very drug conspiracy as to which the alleged contemnor was withholding evidence.

**15.** If it is not self-evident, one need look no further than this Court's decision in the subpoena litigation to find supportive authority. There, of course, the Court held quite plainly that the status of the relationship between at-

not perceive except as essential to an attorney's rendering of competent representation at a time when the representational relation is uniquely vulnerable, is sorely tested, indeed, affronted by the narcotics prosecutor's conduct in the underlying subpoena litigation.

Here, Ms. Stewart was served with a subpoena in July 1989 to testify before the Grand Jury that had indicted her client and which, lately in receipt of the evidence of a highly placed coconspirator (Torres), was poised to hand down a superseding indictment. Under the circumstances, Ms. Stewart could not view the subpoena's demand for information facilitating the indictment of the conspiracy's alleged leader as benign to the interests of her client; nor could she view the subpoena, issued at a time when her client had already been incarcerated for some six months and plea negotiations were not progressing productively, other than as subversive of the already amply stressed relation she maintained with her client;[16] her client could not be expected to meet the prospect of her visit to the secrecy of the Grand Jury room with equanimity. Given these circumstances and the unsettled state of the law governing the issuance of Grand Jury subpoenas to defense counsel, Ms. Stewart understandably felt obliged to challenge the subpoena and did so, arguing in essence that the subpoena ought not to have been issued because of its considerable potential, under the circumstances, to be destructive of the attorney-client relation and, with it, of her client's Sixth Amendment right to counsel. While not minimizing the gravity of Ms. Stewart's claim, Justice Snyder, as noted, denied the motion to quash, finding that the right to counsel was outweighed by the Grand Jury's superior, albeit nonconstitutional, claim of right to information, which, while perhaps not absolutely necessary to its investigation, was nevertheless relevant thereto and not, in the court's estimation, otherwise reasonably obtainable. Ms. Stewart's appeal of Justice Snyder's ruling ensued, and key to the arguments placed before this Court as well as to this

torney and client was crucial to the timing of an attorney's obligation to respond to a subpoena, indeed, the very subpoena here at issue (156 AD2d 294, *supra*). If the enforceability of an attorney's obligation to testify before a Grand Jury depends upon the status of the attorney's representational relationship with an indicted client, it follows necessarily that knowledge of that status is essential to an attorney's decision as to how to respond when subpoenaed.

16. It is a matter of record that subsequent to being subpoenaed Ms. Stewart felt it necessary to curtail her contact with Maldonado and that Maldonado complained of difficulty contacting her.

Court's eventual disposition of the appeal, was the existence of a viable attorney-client relationship between Ms. Stewart and her client, Dominick Maldonado. Indeed, it was precisely to safeguard that "extant" relationship from the " 'chilling effect' " of the Grand Jury subpoena that the majority held that enforcement of the subpoena should be stayed until the underlying representational relation had come to an end (156 AD2d, *supra,* at 294). And, conversely, it was because the dissenters could find no evidentiary support for the allegation, accepted by the majority, that the "extant" relationship had been chilled, that they advocated the immediate enforcement of the subpoena. What neither the Judges of this Court nor Ms. Stewart knew, however, was that by the time the appeal was decided in late December 1989, Ms. Stewart's attorney-client relationship with Dominick Maldonado had already been irreparably ruptured—that nearly a month prior to this Court's decision in the matter, Ms. Stewart had been effectively displaced as Maldonado's counsel by "shadow counsel". Yet, not even in the aftermath of the appeal, when the extent of the Court's reliance on the supposedly "extant" representational relationship was made unmistakably clear, was Ms. Stewart's true representational status divulged. To the contrary, the People, in their motion for leave, implicitly represented that the relationship continued—that because of the underlying attorney-client relationship and the coterminous stay imposed by this Court, the Grand Jury inquiry would be stymied indefinitely.[17] Indeed, the very issue the People would have had reviewed by the Court of Appeals was whether the existence of the assertedly ongoing representational relation was a sufficient predicate for a stay such as the one issued.[18] As noted, matters continued in this fashion—the parties going

17. To be perfectly fair, it should be pointed out that the Appeals Bureau of the New York County District Attorney may not at the time of the motion for leave have been aware of the demise of Ms. Stewart's attorney-client relationship with Maldonado. It is not ascertainable upon the present record if and when the Office of the Special Narcotics Prosecutor divulged that apparently very closely held information to appellate cocounsel in the Appeals Bureau. Given the Narcotics Prosecutor's demonstrated penchant for secrecy, however, it seems altogether possible that not even appellate cocounsel was advised of the shadow counsel proceedings.

18. In their motion for leave to appeal to the Court of Appeals, the People stated, "the issue at stake is now whether members of a criminal conspiracy may retain lawyers for their indicted accomplices, engage in non-privileged conversations with those attorneys, and be able to prevent disclosure of those conversations for as long as the underlying representation of the indicted defendants continues."

through the motions of litigating an issue which, as framed by the People, had long since been rendered moot by events known to the People but not their adversary, and it was not until June 1990 that the true status of Ms. Stewart vis-à-vis the individual she had taken to be her client was disclosed, and then only when the disclosure was compelled over the People's objection. The parties then adjusted their stances to the newly acknowledged but long pending reality: Ms. Stewart formally withdrew as Maldonado's attorney and the People withdrew their appeal and proceeded to schedule Ms. Stewart's Grand Jury appearance, albeit without any great haste.

The nondisclosure, indeed, active suppression, of the true status of Ms. Stewart's representation between November 1989 and June 1990 is comprehensible only as a concession to the shadow counsel arrangement into which the narcotics prosecutor, Justice Snyder and Dominick Maldonado, with the assistance of assigned counsel, entered in November 1989. Indeed, but for the court's agreement to go to such extraordinary lengths to facilitate Maldonado's attempt at cooperation, there would have been every incentive, particularly in the aftermath of this Court's ruling, to make Ms. Stewart's displacement as Maldonado's counsel known. This Court had, after all, ruled that the single circumstance preventing immediate enforcement of the Grand Jury subpoena was the pendency of an underlying attorney-client relation. And, knowing, as the People did, that the subject attorney-client relationship had already been irretrievably compromised, and, accordingly, that the only legal impediment to the subpoena's enforcement had been effectively removed, immediate steps could have been taken to enforce the subpoena, and so, to obtain the testimony of the witness whose evidence the People persist in describing as having been essential to the indictment of the conspiracy's head. That they did not do this, that they chose instead indefinitely to delay their pursuit of the conspiracy's kingpin during the pendency of an "appeal" they knew to be a sham or, alternatively, for the duration of a representational relationship which they also knew to be a sham, can only be taken as an index of the depth of the narcotics prosecutor's commitment to the shadow counsel scheme. It is also sadly indicative of just how profoundly confused and conflicted the People's position had become in the underlying narcotics prosecution.

The very troubling question unavoidably raised by the record on this appeal is how the narcotics prosecutor's commitment to facilitate the cooperation of one defendant in a drug

conspiracy prosecution—a defendant who manifestly had little to offer[19]—could have been allowed to interfere, as it apparently did, with the Grand Jury's access to evidence assertedly necessary to indict the conspiracy's leader. The shadow counsel arrangement, it appears, had ensnared the narcotics prosecutor in a conflict: his duty zealously to prosecute narcotics offenders—and here an offender allegedly of the first order—had fallen hostage to his agreement to facilitate an elaborate dissemblance in order to induce the cooperation of an indicted coconspirator who would only cooperate if he could, as he put it, "be on the safe side". While this precise conflict may not have been foreseeable at the time the shadow counsel arrangement was instituted, surely an objective evaluation of the scheme such as the court, if not the prosecutor, was bound to perform, ought to have revealed some of its many prohibitive ramifications.

The shadow counsel arrangement is aptly named, for its intended effect is to make a screen of right-seeming judicial appearance in order to hide a defendant's attempt at cooperation and thereby protect the would-be cooperator from retribution. The cooperation, all of the judicial transactions incident thereto and those following therefrom may thus be said to occur in the "shade" of proceedings fabricated to create the supposedly protective illusion that the defendant's stance vis-à-vis the prosecution has not changed. The concept of using the court and its processes as instruments of assertedly benevolent deception is, however, an inherently dangerous one, which, while perhaps appealing to the untempered zeal of a prosecutor, ought never to have been embraced by a Judge. This entirely novel device, hitherto unknown to appellate jurisprudence in this jurisdiction—itself a creature of the shadows—was not merely "distasteful", it entailed conduct prima facie violative of ethical injunctions against direct and unauthorized

---

**19.** This is clear not only in retrospect from the 100-year-to-life sentence Maldonado received, but ought to have been clear at the time Maldonado offered to cooperate; Torres, the conspiracy's second-in-command, had by then already been caught and was himself cooperating. In this context, it was not likely that Maldonado would have had much to add and, indeed, the prosecution's above-described modification of its plea bargain stance pursuant to which the defendants were presented with a take-it-or-leave-it offer to plead to the indictment's top count and receive a sentence of 15 years to life, fully reflected a contemporaneous understanding that, in the aftermath of Torres's cooperation, the cooperation of the remaining uncooperative codefendants was entirely dispensable.

contacts with a represented adversary[20] and ex parte communication with the court.[21] Worse, it involved the court in a completely false inducement to cooperation, for, as the within litigation so vividly illustrates, the shadow counsel arrangement, by reason of its fundamental incompatibility with the prosecutor's disclosure obligations—obligations whose satisfaction courts have repeatedly held essential to the basic fairness of a prosecution—was not ultimately sustainable. At a minimum, perpetuation of the shadow counsel arrangement in the litigation here at issue would have necessitated withholding *Rosario* material from the defense and would thus have placed any convictions subsequently obtained in the drug conspiracy trials in utmost jeopardy. While Ms. Stewart's obviously confused client, Maldonado, might not have understood that the appointment of "shadow counsel" was not a viable means of keeping his attempt at cooperation secret, certainly this was something which the court ought to have understood and explained to him. To have instead indulged the defendant's misguided belief that his safety as a cooperator might be insured by such a demonstrably and foreseeably inefficacious exercise in judicially sponsored deceit was both imprudent and unethical. Indeed, it was all the more unforgivable here, where, quite apart from the manifest futility of the shadow counsel arrangement, there was serious reason to doubt Maldonado's

---

**20.** Code of Professional Responsibility DR 7-104 (22 NYCRR 1200.35) provides, "(A) During the course of the representation of a client a lawyer shall not: (1) Communicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by a lawyer in that matter unless the lawyer has the prior consent of the lawyer representing such other party or is authorized by law to do so."

**21.** DR 7-110 (22 NYCRR 1200.41) provides:

"(B) In an adversary proceeding, a lawyer shall not communicate, or cause another to communicate, as to the merits of the cause with a judge or an official before whom the proceeding is pending, except:

"(1) in the course of official proceedings in the cause;

"(2) in writing if the lawyer promptly delivers a copy of the writing to opposing counsel or to an adverse party who is not represented by a lawyer;

"(3) orally upon adequate notice to opposing counsel or to an adverse party who is not represented by a lawyer; or

"(4) as otherwise authorized by law, or by section A (4) under Canon 3 of the Code of Judicial Conduct."

The judicial complement to this Disciplinary Rule (Code of Judicial Conduct Canon 3 [A] [4]) provides in relevant part: "A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding."

claim that his cooperation would place him and his family in imminent danger, and no reason at all to suppose that any risks attendant upon his cooperation might be diminished by keeping his cooperation a secret from the lawyer who had represented him since the prosecution's inception.

Maldonado, it will be recalled, only uttered the magic words as to his and his family's jeopardy after extensive leading by both the court and the prosecutor. Over the course of his two private conferences with Justice Snyder, he had represented variously that he had no fear of any retributive consequences from cooperating;[22] that he would discuss the cooperation option with Ms. Stewart;[23] that he would fire Ms. Stewart[24] and attempt cooperation with the assistance of a court-appointed attorney; and, finally—after being advised by Justice Snyder that he could not cooperate with a court-appointed lawyer while affecting to continue his representational relation with Ms. Stewart unless there was some "overwhelming reason" why Ms. Stewart could not know about his attempted cooperation, namely, that her knowledge of his cooperation would place him in danger—that Ms. Stewart's knowledge of his cooperation was indeed dangerous to him. Maldonado's indirection and inconsistency in acknowledging a risk which had it been genuinely perceived could not have been perceived except as palpable, hardly bespeaks an urgently felt need for protection. Nor was the existence of some imminent risk to Maldonado by reason of his cooperation otherwise confirmed. Maldonado reported no specific threats to his safety, and Luis Torres, Maldonado's immediate superior in the drug conspiracy, had already openly entered into a cooperation agreement, the existence of which the prosecution, apparently not overly concerned for Torres' safety, did not hesitate to advertise when it seemed advantageous to do so. Moreover, assuming that there was some danger, the defendant furnished no reason to suppose that Ms. Stewart was its source. Maldonado had, in fact, never maintained that Ms. Stewart would betray his attempted cooperation to "Lincoln"; all that he had said was that if he fired Ms. Stewart, "Lincoln", who was "too smart", would get wind of that development and would want to know why the

---

**22.** *See, supra,* at n 12.

**23.** *Ibid.*

**24.** At the November 16, 1989 shadow counsel proceeding Herschman queried Maldonado, "I think it only boils down to one question: Can you fire Miss Stewart if you want to? Do you feel you and your family are safe if you do that?", to which Maldonado replied, "Okay. I fire her."

counsel he had provided had been discharged. But, as noted, Maldonado's misconceptions notwithstanding, whether he fired Ms. Stewart openly or was secretly assigned substitute counsel, his attempt at cooperation was not a circumstance which it would have been possible to hide indefinitely. Cooperation for a defendant in a drug conspiracy prosecution may well be a risky undertaking, but the risk, properly understood, stems from the all but unavoidable disclosure of the cooperator's betrayal of his partners in crime, not from the fact that the cooperator's counsel may have been provided by a "benefactor" from the conspiracy.

Bereft of its safety rationale, the shadow counsel arrangement simply cannot be justified. If representation provided a defendant by an interested third party has become conflicted, and for that reason stands as an obstacle to a defendant's exploration of cooperation as a means of obtaining a relatively favorable disposition, there appears no reason why such a conflict, if adequately shown, should not be dealt with in the usual manner, by open substitution of counsel. As for Ms. Stewart, however, there was no ground warranting her substitution.[25] There is no indication in this record that Ms. Stewart had, in fact, allowed the source of her payment, whatever it was, to interfere with her independent judgment as to the best interests of her client.[26] Nor is there basis for the supposition that if Maldonado had broached the subject of cooperation with Ms. Stewart, she would have given him conflicted advice. While she might well have advised him not to cooperate, such advice would not have been objectively unjustifiable or necessarily attributable to divided loyalty. Maldonado quite evidently had nothing of value to offer the prosecution and the prosecution, accordingly, was making no promises in exchange for his cooperation. Under the circumstances, Maldonado had little to gain and may have had much to lose by consenting to be "debriefed" by the prosecutor.[27] Certainly, he could have done no worse than the 100-years-to-life sentence he received

**25.** Indeed, even as Justice Snyder authorized Ms. Stewart's displacement as Maldonado's counsel, she would observe with obvious reference to Ms. Stewart, "no one at this point is making any judgment about anybody".

**26.** There is accordingly no basis for the People's present appellate speculation that Ms. Stewart may have violated Code of Professional Responsibility DR 5-107 (22 NYCRR 1200.26).

**27.** The considerable risks a cooperating defendant encounters in the course of his or her debriefing have recently been acknowledged by the Second Circuit Court of Appeals in *United States v Ming He* (94 F3d 782, 789-790). Recognition of the magnitude of those risks impelled the *Ming He* court

if, on the advice of counsel, he had refrained from cooperating with the prosecutor.[28] Indeed, one must wonder whether such advice coming from Ms. Stewart would not have been considerably less susceptible of characterization as conflicted than the advice Maldonado actually received from the lawyer hand picked by the court to facilitate his attempted cooperation. That attorney, it will be recalled, announced that it was not his policy to take any position at all as to the advisability of a defendant's cooperation with the prosecution. One must wonder as to the purpose of legal representation in connection with a defendant's contemplated cooperation if it is not to provide some recommendation as to whether cooperation is in fact likely to be beneficial to the defendant. That, of course, can be an extremely complex calculation, the proper address of which would require, at a minimum, a careful and thorough assessment of the strength of the case against the defendant and an accurate understanding of the value to the prosecution of any barterable information possessed by the defendant. Can it be that a lawyer, assigned on the spot to represent a defendant in connection with the defendant's attempt at cooperation, could, after only minutes with the "client" and virtually no opportunity to become acquainted with the extensive evidence in the underlying, exceedingly complex multidefendant drug conspiracy prosecution, competently weigh his client's options? Obviously not. Yet, this is precisely what occurred in the case of Dominick Maldonado. Far from providing Maldonado with competent, conflict-free representation, the secret appointment of "shadow counsel" perversely insulated him from the sort of advice he most urgently needed at so crucial a juncture, advice which Ms. Stewart, having represented him from the outset, was best situated to provide. If the objective of substituting counsel is to provide a criminal defendant with continued effective representation, that end cannot be said to have been served in Maldonado's case by the appointment of shadow counsel; if, on the other hand, shadow counsel's intended function was simply to grease the rails leading to the prosecutor's debriefing room, the appointment of shadow counsel was a great, if impermissible, success.

---

to hold, pursuant to the Second Circuit's supervisory rules, that a cooperating defendant could not be debriefed without the assistance of counsel unless such assistance was affirmatively waived.

   28. Indeed, had Maldonado simply accepted the prosecutor's offer to plead to the indictment's top count in exchange for a sentence of 15 years to life, he would have been very much better off than he eventually found himself in the aftermath of his attempt at cooperation.

Surely, there is irony in the circumstance that the narcotics prosecutor, having relied upon a device patently violative of disciplinary rules and both fundamentally and gratuitously vitiative of the adversary process, should now complain so bitterly of Ms. Stewart's disrespect for the rule of law. Yet, it is not for mere irony that the within indictment must be dismissed. It is rather because the People's conduct in perpetuating the shadow counsel scheme had the direct and palpable effect of preventing Ms. Stewart from fully and fairly litigating the validity of the Grand Jury subpoena she is said to have violated.

Ms. Stewart set about challenging the legality of the subpoena served upon her, claiming, *inter alia*, that the subpoena ought never to have been issued because of its potential under the circumstances to damage and, ultimately, completely disrupt her ongoing relationship with her client. Obviously, then, the occurrence of a complete rupture in the attorney-client relationship, such as the one which took place in late November 1989, was highly material to Ms. Stewart's central claim: with her displacement as Maldonado's counsel, Ms. Stewart might have argued with considerable force that the subpoena's subversive potential had been fully realized. She was, however, prevented from marshalling the actual demise of the representational relationship in support of her motion to quash by the prosecutor's commitment to the shadow counsel scheme, a commitment which was apparently deemed more important than the fairness and integrity of the subpoena litigation. Ms. Stewart had essentially been turned into a decoy. Pursuant to the shadow counsel strategy, she was to act as Maldonado's attorney so as to create the impression that Maldonado remained a loyal member of the defense camp, but at the same time was to be deprived of information essential to the litigation of both her interests as a criminal defense attorney and those of her putative client.

When an attorney is placed in such a position and is, by design, left to litigate highly important matters with a woefully incomplete deck, it is not merely the attorney that ends up acting as a decoy, but the judiciary. Indeed, the shadow counsel scheme requires for its perpetuation not merely the blessing but the active participation of Judges, participation which was in the conspiracy prosecution and related subpoena

litigation willingly provided by Justice Snyder,[29] but, on appeal, simply exacted from an unwitting Bench. This Court's decision of the appeal of the denial of the motion to quash was reduced, by the prosecution's obsessive and singular devotion to its shadow counsel scheme, to nothing more than a moot exercise. As noted, the Court premised its determination fundamentally upon the existence of an underlying attorney-client relation between Ms. Stewart and Maldonado, but, as the narcotics prosecutor well knew and evidently chose to conceal, that relationship had been irretrievably compromised well before this Court's decision was issued. There is no doubt that had that singularly important development been disclosed, as it should have been, this Court's decision would have been different. As it was, rather than decide a real case or controversy, the Court was placed in the position of deciding one concocted for no more lofty purpose than the perpetuation of a deceit.

It is no answer to say, as the prosecution doubtless will and the majority on the present appeal now has, that Ms. Stewart was not prejudiced by the suppression of her status vis-à-vis Maldonado, since, had that circumstance been known to her and this Court, the Bench would have been unanimous not only in denying the motion to quash but in requiring her immediate appearance before the Grand Jury. It cannot be presumed that this would have been the outcome. Had Ms. Stewart persuasively made out the connection between the issuance of the subpoena and the eventual termination of her representation of Maldonado, who is to say that the court might not have deemed the subpoenas so potentially injurious to the attorney-client relationship as to render their very issuance violative of Maldonado's right to counsel. As Justice Andrias perceptively observed in ruling upon the motion: " 'The very presence of the attorney in the grand jury room, even if only to assert valid privileges, can raise doubts in the client's mind as to his lawyer's unfettered devotion to the client's interests and thus impair or at least impinge upon the [lawyer]-client relationship.' (*In re Grand Jury Investigation [Sturgis]*, 412 F Supp 943, 946 [ED Pa 1976].) One cannot help but ask if

---

**29.** Indeed, on one of the many instances of judicial dissemblance necessitated by the shadow counsel scheme, Justice Snyder would note, as she signed an order directing Maldonado's conveyance to what was in fact a wholly fictitious lineup, "All right. For the reasons you [prosecutor] have indicated and with Mr. Schwartz's consent I will sign this order. *Of course I realize it is not a truthful statement for the purpose of which he is going to be released in the officer's custody.*" (Emphasis supplied.)

that is what occurred here. Ms. Stewart was first served with a subpoena on or about July 5, 1989. The litigation over the motion to quash lasted the summer and fall of 1989 and on November 9, 1989, apparently on his own initiative, Ms. Stewart's client, Mr. Maldonado, called the prosecutor" (158 Misc 2d 776, 778-779, *supra*). Certainly, the majority at the Appellate Division, even while ignorant of the extent of the actual damage arguably attributable to the subpoenas, came very close to holding that the subpoenas ought not to have been issued when they were, holding instead that they ought not to have been enforced when they were issued, and who is to say that the dissenters, having premised their disagreement with the stay imposed by the majority upon the lack of evidentiary support for Ms. Stewart's claim that the subpoenas enforcement would have a "chilling effect", would not have altered their position had they had before them factual argument persuasively demonstrating that the effect of the subpoenas was not merely "chilling" but lethal. This is not to say that such an argument by Ms. Stewart would have prevailed, only that she was entitled to prosecute her appeal, and the Court was entitled to consider and decide the appeal, on the basis of the facts as they actually were.

What is more, even if this Court had, on the basis of a record corresponding to the true state of affairs, simply affirmed the denial of the motion to quash, Ms. Stewart would still have been in a more tenable position than the one in which she eventually found herself. In receipt of this Court's decision in December 1989, Ms. Stewart, relying on that decision and what she had been led to believe was the existence of a viable underlying attorney-client relationship with Dominick Maldonado—a relationship which she did not expect to end any time soon, Maldonado's trial still being a relatively distant eventuality—reasonably believed that she had won a substantial, even if not total, victory. As a practical matter, it must have seemed to her unlikely that she would have to appear before the Grand Jury in the near future, and, indeed, there must have appeared a very strong likelihood that she would never appear since, if the Grand Jury continued to pursue "Lincoln" seriously during the term of the presumably lengthy stay, it might well find another source of evidence corroborative of "Lincoln"'s role in the conspiracy, or, failing that, conclude its long-pending probe without indicting "Lincoln". It was thus reasonable for Ms. Stewart, knowing what she then knew, to decide against appealing that part of this Court's order affirming the denial of

the motion to quash. She thus forbore from appealing, and opposed the People's motion in this Court for leave to appeal respecting the stay, upon the considered judgment that her interests and those of her putative client would be best served by relying on this Court's stay.

That stay, however, was the peculiar product of the prosecutor's failure to disclose the fact that the supposedly "extant" attorney-client relationship, which it was the purpose of the stay to protect, was, in truth, no longer extant. Had the Court been apprised of the actual state of affairs, there would thus have been no stay; Justice Snyder's order would simply have been affirmed, in which case Ms. Stewart would certainly have appealed, or reversed, predictably leading to an appeal by the People. In either case, the central issue on the appeal would have been the constitutional validity of the Grand Jury subpoenas, which issue then would have been conclusively resolved by the State's high Court in advance of any Grand Jury appearance by Ms. Stewart or any attempt by the People to sanction her for failing to appear or otherwise comply with the subpoena's demand. Of course, what happened instead was that Ms. Stewart, having been kept in the dark as to the status of her relationship with Maldonado, continued to rely on this Court's stay for a matter of months, only to find out long after her time to seek leave to appeal had run out, that the "stay" was entirely illusory, that the condition upon which it had been premised was and had been nonexistent from the time of the stay's issuance.

I think it clear that Ms. Stewart altered her position in the subpoena litigation in reliance upon a crucial and grievous misrepresentation by the People and that she was, as a consequence, effectively foreclosed from thoroughly and effectively litigating the very substantial constitutional issues raised by the Grand Jury subpoenas. Those issues thus went unresolved by the Court of Appeals, leaving this Court's order—itself the product of an appellate process distorted by prosecutorial misrepresentation—as the sole basis for the eventual enforcement of the Grand Jury subpoena. The integrity of that order having been significantly compromised by the People's conduct, it would seem to me that the nature of Ms. Stewart's obligation vis-à-vis the Grand Jury was far from clear when she finally appeared before it in January 1991. The issue before us, however, is not whether the indictment charging Ms. Stewart with criminal contempt should be dismissed for legal insufficiency, as well it might be if her testimonial obligation was not

unambiguously clear, but whether prosecution of the indictment is consistent with the ends of justice. And, while the former inquiry may be debatable, it would seem to me that the latter is not. The within prosecution for felony contempt, resting as it does upon an order tainted by prosecutorial misrepresentation and upon a course of prosecutorial conduct that effectively denied the defendant a full and fair opportunity to litigate important and still unsettled issues respecting the legal and ethical propriety of her refusal as an attorney to testify before a Grand Jury investigating matters in which her client had been implicated, cannot be said to vindicate any principle of justice. To the contrary, this prosecution and the events out of which it arises are exemplary of nothing so much as what occurs when an assertion of naked prosecutorial power is permitted to run amok in derogation of precepts and practices commonly thought essential to the fair and true administration of justice.

As an addendum, a few words are appropriate in response to the majority writing. While the majority purports to adhere scrupulously to the criteria of CPL 210.40 governing dismissals in furtherance of justice, it is plain that the statute, as employed by the majority, does not function as a neutral guide to consideration but rather as a blind whose significant areas of opacity screen from view aspects of the record which the majority may with good reason find highly disquieting. It is only thus that the majority is able to dispense with subdivision (1) (e), which requires consideration of "any exceptionally serious misconduct of law enforcement personnel in the * * * prosecution of the defendant", with the bare and, in view of the above-recounted record, altogether remarkable, assertion that "there has been no misconduct by law enforcement personnel". But, utterance does not make a proposition so, and it would be hard to imagine a proposition more discordant with the reality to which it claims correspondence than this assertion by the majority. The record which the People have seen fit to place before us demonstrates in excruciating detail how the narcotics prosecutor in derogation of ethical injunctions against direct and unauthorized contacts with a represented adversary and ex parte communications with the court, conceived and implemented a plan to deceive opposing counsel. It shows further that in singular devotion to this plan, which involved affirmative misrepresentations of fact and patent falsification of judicial processes, the narcotics prosecutor succeeded in keeping critically important information from both defense counsel

and this Court. And, it is clear that the result of this serious abuse of process was, the majority's sadly misplaced attempt at irony notwithstanding, to alter the course of the litigation in a most consequential and unfair way: as noted, Ms. Stewart was deprived of her strongest arguments in this Court; this Court issued a decision which it would undoubtedly not have made but for the prosecutor's failure to disclose the actual state of affairs; and, Ms. Stewart, in entirely justifiable reliance upon our fatefully moot decision, made important and ultimately irretrievable decisions as to the subsequent course of the subpoena litigation. As a public officer, bound not simply to strive for convictions but to do what is just, the narcotics prosecutor had an absolute obligation to be candid with the court and to deal fairly with his adversaries (*People v Steadman*, 82 NY2d 1, 7; *People v Pelchat*, 62 NY2d 97, 105; *see also, People v Vilardi*, 76 NY2d 67, 76; *People v Simmons*, 36 NY2d 126, 131-132). It takes no great discernment, merely the discipline not to blink at what is there, to understand that the narcotics prosecutor's conduct of the litigation relevant to the subpoenas and their enforcement fell far short of these very basic ethical requisites.

While the majority takes umbrage at the foregoing characterization of its use of the statute and view of the record, it may be fairly asked whether different conclusions may be rationally drawn when the majority, while admitting the possibility that the subpoena litigation may have been tainted by prosecutorial misrepresentation, maintains that if such misrepresentation did occur it is not redressable as "exceptionally serious misconduct of law enforcement personnel" pursuant to CPL 210.40 (1) (e). What, one might well inquire, would be redressable under the rubric of CPL 210.40 (1) (e), if not the course of prosecutorial conduct splayed upon this record? The majority has not merely eschewed application of the statute, but effectively consigned one of its provisions to legal oblivion.

With similar want of justification, the majority bristles at the within condemnation of the narcotics prosecutor's shadow counsel scheme. The majority complains in this regard that a court's unwillingness to accede to such a scheme would hinder prosecutorial efforts to protect witnesses and expose errant attorneys. Yet, if the within record demonstrates anything it is that the shadow counsel scheme is a singularly inefficacious way of protecting prospective prosecution witnesses and that, far from facilitating legitimate prosecutorial ends, it may well end up binding a prosecutor to a course of conduct incompat-

ible with the prosecutor's discharge of his prosecutorial obligations. That is, of course, what happened in the Maldonado prosecution. Having agreed to humor Maldonado in the exceedingly benighted notion that his safety as a cooperator might be assured by commandeering judicial processes to deceive his lawyer, the prosecutor found himself committed to a course of dissemblance which prevented him from moving expeditiously to indict the narcotics conspiracy's alleged leader. Assuming the validity of this Court's order of December 1989, affirming the denial of the motion to quash, the narcotics prosecutor could have sought enforcement of the Grand Jury subpoena requiring Ms. Stewart's assertedly indispensible evidence immediately upon the issuance of that order. As noted, the prosecutor's failure to take this step is explicable only by reason of the prosecutor's highly improvident commitment to the shadow counsel arrangement, which arrangement was not finally exposed until June of 1990. Nor is it possible on the present record to justify resort to the shadow counsel scheme as a means of exposing "possibly criminal participation by attorneys in furtherance of the drug trade". Ms. Stewart has never been accused of criminal participation in the drug trade. Indeed, she was subpoenaed precisely because it was thought that she would be able to provide *nonaccomplice* corroboration of "Lincoln" 's involvement in the conspiracy.

Considerations of prosecutorial utility aside, however, the principal objection to the shadow counsel scheme must be that it impermissibly involves the court in facilitating prosecutorial ends and that it does so by implicating Judges in a course of deception fundamentally incompatible with the basic integrity of the judiciary and the proceedings over which Judges preside. The court has no interest in assisting a prosecutor to elicit a defendant's cooperation and particularly may not do so by encouraging an essentially uncounseled, if not unrepresented, defendant in the misguided notion that the danger of cooperation may be minimized by deceiving his lawyer. Cooperation is a matter to be worked out by counsel, and if some inducement is necessary to facilitate the cooperation, either in the form of assurances of safety or dispositional consideration, such inducement must, and ordinarily does, come from the prosecutor, not the court. Above all, I would have thought it clear beyond all question that Judges ought never to consent to the use of their auspices for deceit, even if the refusal to do so does indeed hinder some prosecutorial design. No matter how worthy ultimate prosecutorial objectives may seem, the preeminent

concern for Judges must be to assure the integrity of the process by which rights are vindicated. As this litigation all too vividly illustrates, that process simply cannot withstand the introduction of false and highly misleading representations. Once introduced, such representations acquire a corrosive life of their own and it is sheer hubris to suppose that their sequelae may be neatly confined or harnessed discreetly in the service of some justifying end.

It is doubtless true, as the majority observes, that the State's purpose in imposing the authorized sentence for criminal contempt is "to induce people not to refuse to answer questions". There are circumstances, however, when the State may not demand answers to its questions or employ coercive means "to induce people not to refuse to answer." After all the litigation over the validity of the subpoenas issued to Ms. Stewart and cocounsel, it remains unclear whether the State through the Grand Jury may constitutionally demand answers from counsel respecting matters as to which their clients have been indicted and for which they await trial. It is therefore at best doubtful whether the contempt power, utilized as it is here to force a response in such situations by harsh penalization of the failure to respond, serves an end which the law would ultimately countenance. It is not a prudent exercise of judicial discretion that allows the use of such extreme punitive and coercive power for the accomplishment of purposes whose constitutional validity remains far from evident. If Ms. Stewart had had a full and fair opportunity to litigate the extremely important and troublesome issues respecting the validity of the subpoena served upon her and, having lost the day, had then refused to testify, the prosecutor's decision to seek an indictment for criminal contempt would rest on significantly firmer ground. But Ms. Stewart's opportunity to test the constitutionality of the subpoena was seriously subverted by the prosecution's conduct and it is largely because of that conduct that, even at this late date, after years of litigation, the law in the subject area remains so very treacherously unsettled. The majority expresses concern that a dismissal at this juncture will prevent the People from offering their proof in the criminal proceeding. The more appropriate concern, however—indeed, the concern compelled by anything less than a completely ostrich-like appreciation of this record—would appear to be not that the People will be deprived of their day in court but that Ms. Stewart has been denied hers, and that, as a result, an injustice, already great, may, if the felony

contempt prosecution is permitted to continue, be compounded for ends whose legality and social utility are, at best, highly questionable.

In this last connection, it should be noted that the majority's emphatic assertion to the effect that *Matter of Priest v Hennessy* (51 NY2d 62) is dispositive of the validity of the subpoena served upon Ms. Stewart is, notwithstanding the emphasis of its iteration, obviously mistaken. The Court of Appeals in *Priest* held simply that a Grand Jury subpoena seeking information as to the source of an attorney's fee did not intrude upon the attorney-client privilege. No constitutional issues were litigated, much less addressed by the Court in that case. More particularly, no issue was presented in *Priest* as to whether a Grand Jury, having indicted a defendant for participating in a criminal conspiracy, might then, consistent with the indictee's right to counsel in the consequently ongoing prosecution, subpoena the defendant's lawyer to testify respecting the scope of the very conspiracy in which her client had been implicated. Until now, no court has suggested that this issue, which was, after all, the one presented in the litigation over the validity of the subpoena served upon Ms. Stewart, might be settled simply as a narrow question of attorney-client privilege. Indeed, to her credit, Justice Snyder recognized that, in addition to the question of privilege, the subpoena litigation also implicated broader concerns of constitutional magnitude. She noted, "In the instant case, each subpoena has been framed to each attorney in the name of his or her alleged client, a specific defendant in a pending narcotics indictment before this court. *Clearly, the right to counsel of each defendant has attached and Sixth Amendment considerations are involved*" (*Matter of Grand Jury Subpoena of Stewart, supra*, 144 Misc 2d, at 1022; emphasis added). This Court agreed with Justice Snyder that, even though there was no viable claim of privilege, Sixth Amendment concerns were fully implicated by the service of Grand Jury subpoenas on attorneys actively representing indicted clients and, out of deference to those concerns, stayed enforcement of the subpoenas. Given the history of the subpoena litigation, then, it is difficult to discern the basis for the majority's emphatic assertion that the issues presented therein lacked any constitutional dimension. To the extent, however, that the majority may suggest that the demise of the underlying attorney-client relationships extinguished any constitutional concerns, the argument borders on the specious. Even if the People were not estopped from making such an

argument by their active concealment of the very circumstance upon which the argument rests, the argument would be without merit. Ms. Stewart's motion to quash the subpoena served upon her was premised upon the claim that the subpoena was void *ab initio* because of its potential under all the circumstances to undermine and even ultimately destroy her relationship with her client. That claim cannot, in all good conscience, be said to have been mooted by the circumstance that the most dire consequence arguably attributable to the subpoena's issuance did in fact come to pass.

Accordingly, when all is said and done, I do not think it possible, given the history of the subpoena litigation or the facts out of which it arises, to argue sensibly that the constitutional issues raised in that litigation are settled by *Matter of Priest v Hennessy (supra)*. Indeed, the constitutional issues undoubtedly surviving the majority's perfunctory invocation of *Priest* are extremely important ones which Ms. Stewart had every right to litigate. Her right to litigate those issues having been so palpably and inexcusably compromised, it does not seem at all unreasonable for her to suggest that there is a substantial persisting question as to the validity of the subpoena served upon her. Surely, such a suggestion, when viewed in context, in no way justifies likening Ms. Stewart, as the majority has, citing *People v Cruz* (114 AD2d 769), to a habitual criminal. Suffice it to say that the analogy may most charitably be characterized as singularly unfortunate and inapt.

Finally, while I agree with the majority that lawyers are not entitled to special treatment and, accordingly, that a felony prosecution is not avoidable simply because conviction entails the loss of one's license to practice law, it would seem to me equally and corellatively clear that lawyers—and particularly defense lawyers representing a particularly despised clientele— ought not to be singled out by reason of their vocation for disparate prosecutorial treatment. I doubt that there is another case—and certainly research reveals none—in which an attorney's basic right to litigate on her own behalf and that of her client has been so grievously and systematically subverted. Ms. Stewart has been treated in an uncommonly deplorable way by her prosecutorial adversaries, and it is for that reason and not upon some claim to preferential treatment by reason of professional status, that Ms. Stewart is entitled to a dismissal in furtherance of justice. Parity of treatment is a fine concept. It would be well if the majority applied it, not to some hypothetical selected out of thin air to facilitate nice-sounding utterance, but to the case at bar.

The within motion presents an opportunity for the Court not only to avert a tragically unjust outcome but to reaffirm its commitment to neutral and independent adjudication and to a balanced adversary process. Those principles, which we forsake at our own institutional peril and at the still greater peril of the society it is our obligation to serve, require no less than our affirmance of Justice Andrias' wise and courageous decision dismissing the instant indictment "in furtherance of justice".

NARDELLI, RUBIN and TOM, JJ., concur in a Per Curiam opinion; MURPHY, P. J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered on or about May 18, 1993, reversed, on the law and on the facts, the motion to dismiss the indictment denied, and the indictment reinstated.